1997–NMCA–031

938 P.2d 1384

**LAS CRUCES PROFESSIONAL FIRE FIGHTERS and International Association of Fire Fighters, Local No. 2362, Petitioners–Appellees,**

v.

**CITY OF LAS CRUCES and Louis Roman, Las Cruces Fire Department Fire Chief, Respondents–Appellants.**

No. 17415.

Court of Appeals of New Mexico.

Feb. 19, 1997.

William R. Babington, Jr., Shari Lynn Allison, Sager, Curran, Sturges & Tepper, P.C., Las Cruces, Christopher E. Platten and Carol L. Koenig, Wylie, McBride, Jesinger, Sure & Platten, San Jose, CA, for Petitioners–Appellees.

Harry S. (Pete) Connelly, Acting City Attorney, Las Cruces, for Respondents–Appellants.

## OPINION

HARTZ, Chief Judge.

(1) In 1992 the New Mexico Legislature enacted the Public Employee Bargaining Act (the PEBA), NMSA 1978, §§ 10–7D–1 through –26 (Repl.Pamp.1995) (effective until July 1, 1999). The purpose of the PEBA is to guarantee public employees the right to organize and bargain collectively with their employers, to promote harmonious and cooperative relationships between public employers and public employees and to protect the public interest by assuring, at all times, the orderly operation and functioning of the state and its political subdivisions.

Section 10–7D–2. The PEBA created the Public Employees Labor Relations Board (PELRB), Section 10–7D–8, and authorizes local governments to create their own boards, which assume the duties and responsibilities of the PELRB for their employees, Section 10–7D–10(A). The PEBA also authorizes local governments to enact ordinances governing labor relations, subject to certain restrictions contained in the PEBA. Section 10–7D–26(C).

(2) On February 16, 1993 the City of Las Cruces (the City) adopted a labor-management relations ordinance, Las Cruces, N.M., Ordinance ch. 16.5 (1993) (the Ordinance). Section 16.5–6 of the Ordinance created the Las Cruces labor-management relations board (the Local Board). One provision of the Ordinance, which has no counterpart in the PEBA, states that "[a]n employee, labor organization or its representative shall not: ... [s]olicit membership for an employee or labor organization during the employee's duty hours[.]" Ordinance § 16.5–16(2).

(3) The dispute on appeal concerns the application of the Ordinance and the PEBA to fire fighters. Las Cruces fire fighters work on 24–hour shifts. Fire department duties and training are generally restricted to between 8 a.m. and 5 p.m. The hours from 5 p.m. to 8 a.m., called "residential hours," are interrupted only to respond to an emergency; during those hours fire fighters may engage in recreational activities or sleep. Fire fighters are also given a 15–minute morning break, a one-hour lunch break, and a 15–minute afternoon break.

(4) On June 3, 1994 Fire Chief Louis Roman issued a memorandum to his captains and lieutenants forbidding union organizational activities in any fire department facility. The Las Cruces Professional Fire Fighters and International Association of Fire Fighters, Local No. 2362 (the Union) complained that the chief's directive constituted a practice prohibited by the PEBA and the

Ordinance. The Local Board ruled in favor of the Union. The City appealed to the district court, which affirmed the board. On appeal to this Court the City contends that (1) the Union's complaint to the Local Board was untimely, (2) the board's decision was incorrect, and (3) the City did not receive a fair hearing before the board because of the bias of the board's chairperson. We affirm the decision of the district court.

## I. TIMELINESS OF THE APPEAL TO DISTRICT COURT

(5) We assume that the City is correct in contending that the Ordinance requires charges of prohibited labor practices to be filed within 60 days of the conduct that generated the charges. *See* Ordinance § 16.5–8(d). Chief Roman's memorandum is dated June 3, 1994. The City contends that the Union was untimely because it did not file its prohibited practice complaint until August 24, 1994—82 days after the date of the memorandum. The City's contention is frivolous.

■ (6) The Local Board held its initial organizational meeting on July 21, 1994. At that meeting Union President Carlos Reyes informed the board that the Union wished to file a complaint but that it was concerned that 60 days might elapse before the board established any formal procedure for filing a complaint. He tendered a letter setting forth the Union's complaint. Board chairperson Dan Gonzales, acknowledging that the board had not yet established rules and regulations, said that the board would accept the letter as a timely filing of the complaint. The City did not object to this decision. On August 18, 1994 the board adopted interim rules and regulations. They required that prohibited-practice complaints be filed on a board-approved form. The Union then filed its complaint on that form on August 24, 1994.

(7) Submission of the Union president's letter at the July 21 meeting was a timely filing of the complaint. The complaint was not rendered untimely by the Union's decision to supplement the letter with a com-plaint filed in accordance with a newly enacted rule that had not been in effect at the time the letter was submitted and was not even in effect within 60 days of the alleged prohibited practice.

(8) This Court will entertain a motion pursuant to Rule 12–403(B)(4) NMRA 1996 requesting that the City pay the Union $350 for legal fees incurred to respond to the City's frivolous argument.

## II. THE MERITS

■ (9) Both the PEBA and the Ordinance provide that actions by the Local Board shall be affirmed on appeal to the district court unless "the action is: (1) arbitrary, capricious or an abuse of discretion; (2) not supported by substantial evidence on the record taken as a whole; or (3) otherwise not in accordance with law." Section 10–7D–23(B); Ordinance § 16.5–19(c). Under this standard of review we view the evidence in the light most favorable to support the action of the administrative agency. *See Wolfley v. Real Estate Comm'n*, 100 N.M. 187, 189, 668 P.2d 303, 305 (1983). In addition, interpretation of a statute by the administrative body charged with enforcing it may be persuasive. *See City of Raton v. Vermejo Conservancy Dist.*, 101 N.M. 95, 99, 678 P.2d 1170, 1174 (1984); *but cf. High Ridge Hinkle Joint Venture v. City of Albuquerque*, 119 N.M. 29, 39–40, 888 P.2d 475, 485–86 (Ct.App.1994) (noting limits on propriety of deference to agency).

(10) The City relies principally on Section 16.5–16(2) of the Ordinance, which prohibits employees, unions, and their representatives from "[s]olicit[ing] membership for an employee or labor organization during the employee's duty hours[.]" The City contends that the entire 24–hour shift constitutes "duty hours" for a fire fighter and therefore union solicitation is banned from fire stations at all times. The City's interpretation of this section of the Ordinance is reasonable. It is no strain on the English language to say that "duty hours" encompasses all of a fire fighter's paid 24–hour shift.

(11) But the City's interpretation is not the only reasonable one. Although the Local Board's decision in this case fails to refer to Section 16.5–16(2) of the Ordinance, the decision appears to view "duty hours" as the time during which fire fighters are required to be performing job duties. The Union contends that this is the proper meaning of the language of the Ordinance. We agree with the Union because its interpretation better fits the legislative scheme. The City's interpretation conflicts with that scheme. In particular, if the City were to enforce the no-solicitation mandate of Ordinance Section 16.5–16(2) as it interprets the language, it would be engaging in an employer practice that would ordinarily be prohibited by the PEBA and by other provisions of the Ordinance.

(12) To see this conflict, we now turn to the pertinent law regarding employer prohibited practices. An understanding of that law requires an examination of the source of the language used in the Ordinance and the PEBA.

(13) Ordinance Section 16.5–15(2), (3), and (4) is virtually identical with Section 10–7D–19(B), (C), (D) of the PEBA, which states that a public employer or its representative shall not:

(B) interfere with, restrain or coerce any public employee in the exercise of any right guaranteed under the [PEBA][1];

(C) dominate or interfere in the formation, existence or administration of any labor organization;

(D) discriminate in regard to hiring, tenure or any term or condition of employment in order to encourage or discourage membership in a labor organization[.]

Although the PEBA does not require in so many words that local ordinances prohibit the identical practices, it does require that every local ordinance include "prohibited practices for the public employer ... that promote the principles established in Section[ ] [10–7D–19]." Section 10–7D–26(C)(9). The Ordinance therefore cannot countenance conduct that violates the core of the prohibitions in Section 10–7D–19.

(14) The above-quoted language from the PEBA is taken from the National Labor Relations Act (NLRA). Section 8(a) of the NLRA states, in pertinent part:

It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [section 7];

(2) to dominate or interfere with the formation or administration of any labor organization ...;

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization[.]

29 U.S.C. § 158(a) (1994). Section 10–7D–19(B) of the PEBA refers to rights guaranteed by the PEBA, whereas Section 8(a)(1) of the NLRA refers to rights guaranteed in Section 7 of the NLRA; but the rights specified in the two enactments are similar, as can be seen by comparing the provisions set forth in the footnote.[2]

---

**1.** The Ordinance refers to rights guaranteed under the *Ordinance,* rather than under the PEBA. But the rights under the two enactments are essentially the same. *See* footnote 2.

**2.** Section 10–7D–5 (which is substantively identical to Ordinance Section 16.5–4) states:

"Public employees, other than management employees, supervisors and confidential employees, may form, join or assist any labor organization for the purpose of collective bargaining through representatives chosen by public employees without interference, restraint or coercion and shall have the right to refuse any or all such activities."

Section 7 of the NLRA states:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as

(15) Our legislature's selection of language that so closely tracks the NLRA indicates general approval of the operation of that statute. Although the special circumstances of public employment may on occasion require an interpretation of the PEBA different from the interpretation of essentially the same language in the NLRA, the general thrust is clear. Absent cogent reasons to the contrary, we should interpret language of the PEBA in the manner that the same language of the NLRA has been interpreted, particularly when that interpretation was a well-settled, long-standing interpretation of the NLRA at the time the PEBA was enacted. Such an interpretative approach furthers the legislature's evident intent to incorporate certain federal standards into the PEBA. This approach also promotes administrative efficiency. Rather than litigating every matter from scratch, interested parties can largely rely on the body of law developed under the NLRA to expedite the resolution of disputes under the PEBA. We approve of the position of the state PELRB that interpretations of the NLRA by the National Labor Relations Board (NLRB) and reviewing courts should act as a guide in interpreting similar provisions of the PEBA. *See County of Santa Fe & Am. Fed'n of State, County & Mun. Employees,* 1 PELRB 1, 43 (1993).

(16) Thus, in determining whether an employer practice violates Section 10–7D–19(B) or Ordinance Section 16.5–15(2) because it "interfere[s] with, restrain[s] or coerce[s]" an employee in the exercise of rights guaranteed under the PEBA or the Ordinance, we seek guidance from decisions interpreting Section 8(a)(1) of the NLRA. Those decisions establish that under federal law a blanket ban on union organizational activities at the work place would ordinarily constitute an unfair labor practice. In 1945 the United States Supreme Court affirmed an NLRB decision holding that such a ban on any type of solicitation at the employer's factory or offices violated the prohibition against interfering with, restraining, or coercing employ-

ees in the exercise of their rights under Section 7 of the NLRA. *Republic Aviation Corp. v. NLRB,* 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945). The Supreme Court approved the following statement by the NLRB:

> Working time is for work. It is therefore within the province of an employer to promulgate and enforce a rule prohibiting union solicitation during working hours. Such a rule must be presumed to be valid in the absence of evidence that it was adopted for a discriminatory purpose. It is no less true that time outside working hours, whether before or after work, or during luncheon or rest periods, is an employee's time to use as he wishes without unreasonable restraint, although the employee is on company property. It is therefore not within the province of an employer to promulgate and enforce a rule prohibiting union solicitation by an employee outside of working hours, although on company property. Such a rule must be presumed to be an unreasonable impediment to self-organization and therefore discriminatory in the absence of evidence that special circumstances make the rule necessary in order to maintain production or discipline.

*Id.* at 803–04 n. 10, 65 S.Ct. at 988 n. 10 (quoting *In re Peyton Packing Co.,* 49 N.L.R.B. 828, 843–44 (1943)). The NLRB has continued to distinguish between bans on solicitation during working time and blanket bans on solicitation that include work breaks, holding that the latter bans are presumptively invalid. *See Our Way, Inc. v. International Broth. of Firemen,* 268 N.L.R.B. 394, 1983 WL 24767 (1983). The Supreme Court has also continued to approve the position of the NLRB. *See Beth Israel Hosp. v. NLRB,* 437 U.S. 483, 98 S.Ct. 2463, 57 L.Ed.2d 370 (1978) (upholding determination that hospital could not prohibit employees' organizational efforts in employee cafeteria); *cf. NLRB v. Babcock & Wilcox Co.,* 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956) (employer could prohibit union solicitation by nonemployee

a condition of employment as authorized in sec-      tion 8(a)(3)."

union organizers on company-owned parking lots).

■ (17) We conclude that a no-solicitation rule that encompasses rest breaks, lunch time, and residential hours would be presumptively contrary to Section 10–7D–19(B) of the PEBA. It would also violate Ordinance Section 16.5–15(2) unless the Ordinance language is interpreted differently from the virtually identical language in Section 10–7D–19(B) of the PEBA and Section 8(a)(1) of the NLRA. We reject that possibility. As a general rule, when a local ordinance uses the same language as the state statute authorizing the ordinance, we can infer that the local governing body intends its ordinance to have the same meaning as the state statute.

(18) To be sure, the City's enactment of Ordinance Section 16.5–16(2) might be construed as indicating that the City did not intend Section 16.5–15(2) to have as expansive a meaning as Section 10–7D–19(B) of the PEBA. One could say that Section 16.5–16(2) immunizes certain no-solicitation rules that would otherwise be prohibited practices. But in that event the Ordinance might well violate Section 10–7D–26(C)(9), which requires local ordinances to include "prohibited practices for the public employer ... that promote the principles established in [Section 10–7D–19.]" Ordinance Section 16.5–16(2), as interpreted by the City, would appear to be contrary to the core of Section 10–7D–19(B); after all, for more than 50 years (*Republic Aviation* was decided in 1945) federal law has generally prohibited blanket no-solicitation rules that apply during both working time and breaks. Therefore, the better means of resolving potential conflict between Ordinance Sections 16.5–16(2) and 16.5–15(2) is to adopt the Union's interpretation of "duty hours" as time during which job duties are being performed. Then enforcement of Ordinance Section 16.5–16(2) would ordinarily not constitute a prohibited employer practice. Under this interpretation—the interpretation apparently adopted by the Local Board—the fire department's no-solicitation rule was not authorized by Ordinance Section 16.5–16(2).

■ (19) That leaves for consideration only whether the fire department's no-solicitation rule constituted a prohibited practice under Ordinance Section 16.5–15(2). Applying the standard approved in *Republic Aviation*, the rule could pass muster only if "necessary in order to maintain [performance] or discipline." 324 U.S. at 804 n. 10, 65 S.Ct. at 988 n. 10. In the present case the City made no showing that its fire fighting efforts would be hampered if employees were permitted to engage in union organizational activities during residential hours, rest breaks, or the lunch period, when fire fighters were not needed for emergency services. Also, the Union presented as evidence a September 9, 1993 memo from the previous fire chief stating that supervisors "must not try to control what workers do [during] non-working time[,] [including] authorized coffee breaks and lunch time." The memo implies that solicitation during such times would not interfere with fire fighting responsibilities. Consequently, the Local Board could properly determine that enforcement of the no-solicitation rule constituted a prohibited employer practice. We affirm the board's interpretation of the Ordinance and hold that the record supports the board's finding of a prohibited employer practice.

## III. ALLEGED BIAS

(20) Section 10–7D–10(B) of the PEBA provides as follows:

The local board shall be composed of three members appointed by the public employer. One member shall be appointed on the recommendation of individuals representing labor, one member shall be appointed on the recommendation of individuals representing management and one member shall be appointed on the recommendation of the first two appointees.

The Ordinance complies with the statute by stating:

The board shall consist of three (3) members appointed by the mayor and the city council. The mayor and the city council shall appoint one (1) member from a list of

up to three (3) recommended by individuals representing labor representatives, one (1) member from a list of up to three (3) recommended by the city manager, and one (1) member from a list of up to three (3) recommended jointly by the two (2) other appointees.

Ordinance § 16.5–6(a).

(21) The City's complaint of bias relates to the Local Board chairperson, Dan Gonzales, who was the member recommended by labor interests. The City focuses on the conduct of Gonzales during the hearing on the Union's complaint, but it also pointedly notes that Gonzales was the Union's "appointee." Before addressing the specifics of Gonzales's conduct of the hearing, we put the matter in perspective by discussing the general law regarding allegations of bias against administrative tribunals.

(22) The leading New Mexico case is *Reid v. New Mexico Board of Examiners in Optometry*, 92 N.M. 414, 589 P.2d 198 (1979). The City relies on the following language from *Reid*:

> At a minimum, a fair and impartial tribunal requires that the trier of fact be disinterested and free from any form of bias or predisposition regarding the outcome of the case. In addition, our system of justice requires that the appearance of complete fairness be present. The inquiry is not whether the Board members are actually biased or prejudiced, but whether, in the natural course of events, there is an indication of a possible temptation to an average man sitting as a judge to try the case with bias for or against any issue presented to him.
>
> ... The rigidity of the requirement that the trier be impartial and unconcerned in

the result applies more strictly to an administrative adjudication where many of the customary safeguards affiliated with court proceedings have, in the interest of expedition and a supposed administrative efficiency, been relaxed.

*Id.* at 416, 589 P.2d at 200 (citations omitted). This language, however, must be read in context. In *Reid* one of the board members prior to the administrative hearing stated something like "Dr. Reid would be losing his license soon anyway[.]" *Id.* at 415, 589 P.2d at 199. The Court concluded that because the board member had "admitted making a statement indicating his bias and prejudgment of the issues ..., the Board's failure to disqualify [the board member] clearly violated Reid's constitutional right to procedural due process."[3] *Id.* at 416, 589 P.2d at 200.

(23) One should not infer from *Reid* that a member of a tribunal is necessarily disqualified whenever prior conduct of the member indicates a view that would favor one party or the other. If that were the law, no judge could sit on a case after rendering a decision in a similar case. For example, a judge who upheld the validity of a covenant against competition in one case would be barred from deciding the validity of a similar covenant in another case. Likewise, a judge who had severely sentenced a defendant convicted of child sexual abuse would be disqualified from sentencing others convicted of the same offense. As one might expect, the law imposes no such requirement. Bias can take different forms. Whether a bias is disqualifying depends upon the nature of the bias.

(24) An excellent summary of the pertinent law can be found in Professor Davis' treatise on administrative law. Professor Davis has extracted from judicial opinions a helpful framework for determining when a

---

**3.** Although *Reid* treated tribunal bias as a matter of constitutional due process, we need not decide whether the City is entitled to such constitutional protection. Any bias that would violate due process would also render the resulting decision "arbitrary, capricious or an abuse of discretion" within the meaning of Section 10–7D–23(B) of the PEBA and Ordinance Section 16.5–19(c). *See Board of Educ. v. Department of Health,*

*Educ. & Welfare,* 655 F.Supp. 1504, 1545 (S.D.Ohio 1986); *State ex rel. Iowa Employment Sec. Comm'n v. Iowa Merit Employment Comm'n,* 231 N.W.2d 854, 857 (Iowa 1975); *cf. Chambers v. Family Health Plan Corp.,* 100 F.3d 818, 826–27 (10th Cir.1996) (arbitrary-and-capricious standard can take decisionmaker's bias into account).

decisionmaker should be disqualified for bias. He has distinguished five kinds of bias and stated the law regarding each:

(1) A prejudgment or point of view about a question of law or policy, even if so tenaciously held as to suggest a closed mind, is not, without more, a disqualification.

(2) Similarly, a prejudgment about legislative facts that help answer a question of law or policy is not, without more, a disqualification.

(3) Advance knowledge of adjudicative facts that are in issue is not alone a disqualification for finding those facts, but a prior commitment may be.

(4) A personal bias or personal prejudice, that is, an attitude toward a person, as distinguished from an attitude about an issue, is a disqualification when it is strong enough; such partiality may be either animosity or favoritism.

(5) One who stands to gain or lose by a decision either way has an interest that may disqualify; even a legislator may be disqualified on account of a conflict of interest.

3 Kenneth Culp Davis, *Administrative Law Treatise*, § 19:1, at 371–72 (2d ed. 1980) (set out above in paragraph form for easier recognition). We will refer to the types of bias as type 1, type 2, etc. *Reid* involved type 3 bias—a disqualifying prior commitment.

(25) Gonzales's ties to labor may implicate type 1, type 2, or possibly type 3, bias. Because Professor Davis' summary of the law with respect to those types of bias appears to contradict the broad language of *Reid* quoted above, it is worth noting the strong precedential support for that summary.

(26) On the question of whether prejudgment of law or policy is disqualifying, no more striking precedents could be found than the conduct of Justices of the United States Supreme Court. Their actions are reviewed in *Laird v. Tatum*, 409 U.S. 824, 93 S.Ct. 7, 34 L.Ed.2d 50 (1972), a one-justice memorandum opinion in which Justice Rehnquist explains why he is not recusing himself from the case. He relies on what his predecessors had done in similar circumstances. For example, Justice Black was one of the principal authors of the Fair Labor Standards Act, sometimes cited as the "Black–Connery Fair Labor Standards Act," and presented the favorable report of the Senate Labor and Education Committee, of which he was chairman, to the Senate; yet as a member of the Supreme Court he sat in the case that upheld the Act's constitutionality and also in later cases construing the Act. When he was a professor, Justice Frankfurter had been a noted expert in labor law and played an important part in drafting the Norris–La-Guardia Act; yet he wrote the opinion in a leading case interpreting the scope of the Act. Justice Jackson participated in a case raising exactly the same issue as one he had decided as attorney general, in a way opposite to that in which the Court decided it. *Id.* at 831–32, 93 S.Ct. at 11–12. These actions by members of the Supreme Court reflect a recognition that members of all courts (and administrative agencies) are human beings. They cannot avoid having histories or opinions; indeed, they may well have been selected for their offices in part on that basis. Recognition of this reality counsels us against requiring that every decisionmaker start with a clean slate.

(27) Davis' views on type 2 and type 3 bias also find support from the United States Supreme Court. We discuss two leading cases. First, in *Federal Trade Commission v. Cement Institute*, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948), the FTC, based on its own investigation, had submitted reports to Congress and the President stating that an arrangement known as the multiple basing point system violated the Sherman Act because it was equivalent to a price-fixing restraint of trade. Then the FTC filed a complaint against, among others, the Cement Institute and its corporate members. After lengthy hearings the FTC issued a cease-and-desist order against use of the multiple basing point system in the sale of cement.

The cement companies complained that the FTC had prejudged the issue and was prejudiced and biased. The Supreme Court rejected the challenge. The Court assumed that the entire membership of the FTC had formed an opinion, based on its prior ex parte investigation, that the multiple basing point system constituted unlawful price fixing. Yet it stated that one could not infer from the prior actions of the FTC that the members had made up their minds. *See id.* at 701, 68 S.Ct. at 803–04. As Professor Davis has noted:

> The manner in which the Court in the Cement Institute opinion avoided the question whether the Commissioners' minds were "irrevocably closed" is very significant, for, as a practical matter, it makes proof of closed minds virtually impossible. The Court said that the Commission's previous expression of its views about basing points "did not necessarily mean that the minds of its members were irrevocably closed on the subject of the respondents' basing point practices." 333 U.S. at 701 [68 S.Ct. at 803]. Enough to satisfy the Court was the opportunity of members of the cement industry to present their evidence and argument that the basing point system was legal. *Despite the plausible allegation of closed minds, the Court did not require the Commissioners to show that they had open minds, and the members of the industry had no means of proving that the minds were closed.*

Davis, *supra,* § 19:2, at 374 (emphasis in original). We read the *Cement Institute* case as stating that the FTC was not disqualified by its "legislative" fact-finding regarding use of the multiple basing point system, even though the legislative fact-finding may have involved facts relating to the parties subject to the cease-and-desist order, at least in the absence of evidence that the FTC had already committed itself with respect to the facts concerning those parties.

(28) In the second opinion, *United States v. Morgan,* 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941), appellants contended that the Secretary of Agriculture should not have reconsidered the case after it was remanded by a prior decision of the United States Supreme Court. At the time of that decision the Secretary had written a letter to *The New York Times* critical of the Court, stating that the money at issue "rightfully belongs to the farmers." Davis, *supra,* at 375. The Court held that it was not necessary for the Secretary of Agriculture to deny his bias:

> That he not merely held, but expressed, strong views on matters believed by him to have been in issue, did not unfit him for exercising his duty in subsequent proceedings ordered by this Court. As well might it be argued that the judges below, who had three times heard this case, had disqualifying convictions. In publicly criticizing this Court's opinion the Secretary merely indulged in a practice familiar in the long history of Anglo–American litigation, whereby unsuccessful litigants and lawyers give vent to their disappointment in tavern or press. Cabinet officers charged by Congress with adjudicatory functions are not assumed to be flabby creatures any more than judges are. Both may have an underlying philosophy in approaching a specific case. But both are assumed to be men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances. Nothing in this record disturbs such an assumption.

*Morgan,* 313 U.S. at 421, 61 S.Ct. at 1004. *See Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n,* 426 U.S. 482, 493, 96 S.Ct. 2308, 2314, 49 L.Ed.2d 1 (1976); Davis, *supra,* at 375–76.

(29) From the above, it is apparent that Gonzales was not disqualified for bias simply because he was nominated by union interests. Even if he had previously expressed support for aggressive unionization of the public sector, he would not be disqualified. Members of tribunals are entitled to hold views on policy, even strong views, and even views that are pertinent to the case before the tribunal. *Reid* does not hold to the contrary.

(30) We therefore turn to the City's allegations of specific misconduct by Gonzales that

it contends was unfair and demonstrated improper bias. As we understand the City, it is alleging that Gonzales's actions evidenced bias against the City, or at least its fire department management, and favoritism toward the Union. This would be type 4 bias in Professor Davis' summary. The City points to Gonzales's questioning of the Union representative "on matters [the representative] never raised and to matters to which the fire fighters did not testify to. This is before the City even ha[d] the opportunity to cross examine [the representative]." These matters included lunch breaks, coffee breaks, residential breaks, non-working hours, the memo from the prior fire chief, etc. The City also points out that after the Union chose not to cross-examine the fire chief, Gonzales cross-examined the chief at length, including questions on topics not covered by the direct examination.

(31) We have reviewed the portions of the hearing transcript containing the questions and statements by Gonzales that allegedly reflect bias. We find no impropriety, not even a hint of impropriety, in the questioning. Although a written transcript cannot capture a speaker's tone of voice and facial expressions, the questions were intelligent, respectful, phrased in a fair manner, and pertinent to issues to be decided at the hearing. The questions did not indicate any prejudgment by Gonzales or the board itself. Even Gonzales's questioning of both the fire chief and the Union representative regarding the possibility of compromise did not indicate what he thought the compromise should be. On the contrary, Gonzales volunteered that he had not made up his mind.

■ (32) In a jury trial the trial judge must be careful not to ask questions in such a manner as to convey the judge's personal view of the evidence or the merits of the case, see Rule 11–614(B) NMRA 1996, but that would not be a concern with a hearing before the Local Board. There is no reason to forbid the board to consider evidence elicited by its own questions and limit it to evidence elicited by questioning by the parties. See Bernard Schwartz, *Administrative Law* § 6.16, at 338 (3d ed. 1991); *cf. State v. Sedillo*, 76 N.M. 273, 275, 414 P.2d 500, 501 (1966) (trial judge can question witness; judge is more than mere umpire).

(33) In sum, we find no merit to the City's contention that it did not receive a fair hearing from Gonzales or the board as a whole.

## IV. CONCLUSION

(34) We affirm the judgment of the district court.

(35) **IT IS SO ORDERED.**

PICKARD and FLORES, JJ., concur.