2004-NMCA-073

94 P.3d 788

**The REGENTS OF THE UNIVERSITY OF CALIFORNIA, Appellant,**

v.

**NEW MEXICO WATER QUALITY CONTROL COMMISSION, Appellee.**

**No. 23,498.**

Court of Appeals of New Mexico.

April 28, 2004.

Louis W. Rose, Jeff L. Martin, Montgomery & Andrews, P.A., Santa Fe, Deborah K. Woitte, N. Philip Wardwell, Office of Laboratory Counsel, Los Alamos National Laboratory, Los Alamos, for Appellant.

Patricia A. Madrid, Attorney General, Zachary Shandler, Assistant Attorney General, Eric Ames, Special Assistant Attorney General, Santa Fe, for Appellee.

OPINION

CASTILLO, J.

{1} This case requires us to determine whether the New Mexico Water Quality Control Commission (Commission) appropriately adopted a sentence in the water quality standards amended in May 2002. The sentence, contained in 20.6.4.10.G NMAC (2002), reads as follows: "The human health standards for persistent toxic pollutants, as identified in Subsection M of Section 20.6.4.900 NMAC, shall also apply to all tributaries of waters with a designated, existing or attainable fishery use." Subsection M sets forth numeric criteria for persistent toxic pollutants. The Regents of the University of California (Regents), on behalf of Los Alamos National Laboratory (LANL), challenge the Commission's adoption of the sentence as arbitrary, capricious, lacking substantial evidence, and being contrary to law. We affirm.

## I. BACKGROUND

{2} Several interrelated provisions of state and federal law and regulations form the framework for regulating toxic pollutants in surface water. The federal Clean Water Act requires states to establish criteria for specified toxic pollutants, "the discharge or presence of which in the affected waters could reasonably be expected to interfere with those designated uses adopted by the State, as necessary to support such designated uses." 33 U.S.C. § 1313(c)(2)(B) (2000). The Clean Water Act further requires the United States Environmental Protection Agency (EPA) to impose its own criteria if a state's standards fail to comply with the act. 33 U.S.C. § 1313(c)(3). Pursuant to the Clean Water Act, EPA has published its own numeric criteria for priority toxic pollutants and other regulations to implement the act's statutory requirements.

{3} New Mexico's Water Quality Act, NMSA 1978, §§ 74–6–1 to –17 (1967, as amended through 2003) establishes the Commission as the "state water pollution control agency ... for all purposes of the federal [Clean Water] act." Section 74–6–3(E). The Water Quality Act mandates that the Commission "take all action necessary and appropriate to secure to this state ... the benefits of [the] act." Section 74–6–3(E). The Water Quality Act also authorizes the Commission to adopt surface water quality standards (standards), including water quality criteria to protect designated uses of surface waters. Section 74–6–4(C). The Commission has applied criteria as necessary to "secure to this state ... the benefits of [the federal Clean Water Act]." One such benefit is that a state can adopt its own toxic pollutant criteria, rather than having the criteria imposed by the EPA.

{4} The Commission is administratively attached to the New Mexico Environment Department (Department). Section 74–6–3(F). The Department recommends for the Commission's approval those revisions to the state's water quality standards that are necessary to comply with state and federal law and regulations. On November 29, 2001, the Department's Surface Water Quality Bureau petitioned the Commission to adopt a series of amendments to certain sections of the standards. The amended standards were proposed in response to a warning issued by the EPA that the state would be out of compliance with 33 U.S.C. § 1313(c)(2)(B) of the Clean Water Act unless it adopted numeric criteria for priority toxic pollutants or demonstrated to the EPA's satisfaction that such criteria were not needed; failure of the state to do so would risk the EPA's imposing more stringent numeric criteria on New Mexico.

{5} The proposed amended standards included the second sentence of 20.6.4.10.G NMAC, which applied the human health standards for persistent toxic pollutants to all tributaries of waters with a designated, existing, or attainable fishery use. These persistent toxic pollutants include "some of the most ... dangerous chemicals and heavy metals" known to exist, "including dioxins and toxaphene, DDT, PCBs, chlordane, benzopyrene, aldrin/dieldrin, hexacholorbenzene, and tetracholorethylene."

{6} In accord with proper procedure, the Commission scheduled a public hearing on the proposed amendments; the Department gave timely notice of the hearing through publication and direct notice to interested

parties. Prior to the hearing, the Department met with a range of entities, including LANL, and solicited input on the amendments. The Department made certain modifications to the amendments as a result of the meetings. The hearing on the modified amendments was held on March 13 and 14, 2002; representatives of the Department, Regents, the San Juan Water Commission, the Forest Guardians, and a consultant with the Elephant Butte Irrigation District testified on various provisions and submitted written testimony. The New Mexico Mining Association, the United States Department of the Interior, the Pueblo of Isleta, and the New Mexico Municipal Environmental Quality Association submitted written testimony only.

{7} At the Commission's May 2002 meeting, after deliberation and discussion, the Commission unanimously adopted the amended standards with minor changes not relevant to this opinion. The Commission subsequently issued an order to that effect and a statement of reasons for adopting the amendments. Regents appealed · the adoption of the second sentence of 20.6.4.10.G NMAC to this Court pursuant to the Water Quality Act. *See* Section 74–6–7(A) (stating that appeals from regulations adopted by the Commission are taken to this Court).

## II. DISCUSSION

### A. Standard of Review

{8} We are required to set aside the Commission's action if we find it to be "(1) arbitrary, capricious or an abuse of discretion; (2) not supported by substantial evidence in the record; or (3) otherwise not in accordance with law." Section 74–6–7(B); *see Tenneco Oil Co. v. Water Quality Control Comm'n*, 107 N.M. 469, 470–71, 760 P.2d 161, 162–63 (Ct.App.1988).

{9} We first address whether the Commission acted contrary to law. We then analyze whether there was substantial evidence for the Commission's action. Finally, we determine if the action was arbitrary or capricious.

### B. The Commission Acted in Accord with Law

{10} Regents' arguments that the Commission acted contrary to law fall into two categories. First, Regents argue that the Commission's statement of reasons does not comport with our case law in *City of Roswell v. New Mexico Water Quality Control Commission*, 84 N.M. 561, 565, 505 P.2d 1237, 1241 (Ct.App.1972). Second, Regents argue that the Commission failed to comply with statutory requirements of the Water Quality Act, § 74–6–4(C), (D) and § 74–6–6(A), (C), and the Clean Water Act, 33 U.S.C. § 1313(c)(2)(A). We are not persuaded by either set of arguments.

#### 1. Statement of Reasons

{11} The Commission gave the following pertinent reasons for adopting the entire set of amendments to the standards:

4. The changes approved herein to New Mexico's water quality standards protect public health and welfare, enhance the quality of New Mexico's waters, and serve the purposes of the Clean Water Act and the New Mexico Water Quality Act.

5. The changes approved herein ... respect the use and value of the water for water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial and other purposes.

6. The regulatory changes affected herein are designed to meet the EPA *Guidelines*.

{12} Citing our decision in *City of Roswell*, 84 N.M. at 565, 505 P.2d at 1241, Regents complain that the reasons fail because they provide no insight into why the Commission adopted the second sentence of 20.6.4.10.G NMAC. Regents also assert that the statement of reasons does not specifically respond to the concerns about the sentence raised in the testimony of Regents and others. In *City of Roswell*, this Court concluded that we were unable to review from the record what the Commission relied upon in adopting the regulations under consideration in that case. *Id.* at 565, 505 P.2d at 1241. The record "reveal[ed] only the notice of the public hearing, the testimony of the various

experts and others, some exhibits and the regulations." *Id.* We stated that we could not effectively review a decision "unless the record indicate[d] what facts and circumstances were considered and the weight given to those facts and circumstances." *Id.* We held that formal findings were not required but that "the record must indicate the reasoning of the Commission and the basis on which it adopted the regulations." *Id.*

{13} We disagree with Regents that the statement of reasons must state why the Commission adopted each individual provision of the standards or must respond to all concerns raised in testimony. Such a requirement would be unduly onerous for the Commission and unnecessary for the purposes of appellate review. *City of Roswell* does, however, require a record sufficient for appellate review. We observe that the Commission's statement of reasons for adopting the regulations is quite general, more so than approved in other cases. *See Bokum Res. Corp. v. N.M. Water Quality Control Comm'n*, 93 N.M. 546, 552–53, 603 P.2d 285, 291–92 (1979) (approving a set of reasons "similar" to the "rather general statements" given in *N.M. Mun. League, Inc. v. N.M. Envtl. Improvement Bd.*); *N.M. Mun. League, Inc. v. N.M. Envtl. Improvement Bd.*, 88 N.M. 201, 204–05, 539 P.2d 221, 224–25 (Ct.App.1975) (listing the set of reasons for adopting regulations). Nevertheless, we believe it an adequate statement, albeit barely so.

{14} Our review of the entire record in this case reveals it to be thorough and comprehensive; we are able to determine from the record the basis for the Commission's adoption of the regulations. In this regard, our case is distinguishable from *City of Roswell*, where the record was insufficient for appellate review. *City of Roswell*, 84 N.M. at 565, 505 P.2d at 1241. Here, there are more than one thousand pages in the record proper, including five hundred pages of transcript, all exhibits, and several tapes of deliberations. The record shows that the Department's staff presented to the Commission substantial explanations of the purposes of the regulations, a section-by-section analysis, including 20.6.4.10.G NMAC, and

twenty-one exhibits. The Commission heard Regents' cross-examination of the Department's staff, Regents' own testimony, and the Department's cross-examination of that testimony. Furthermore, on direct examination, the Department presented to the Commission a point-by-point rebuttal of Regents' arguments. Regents also presented written testimony and exhibits. As a result of the hearing, the Department proposed additional changes to certain portions of the proposed amendments; Regents submitted comments on those changes. From the record containing oral testimony, written testimony, exhibits, comments, and statement of reasons, this Court has a sufficient foundation to perform its task of review. *See Bokum Res. Corp.*, 93 N.M. at 552–53, 603 P.2d at 291–92 (rejecting an argument that the Commission failed to comply with *City of Roswell* when the Commission submitted a general statement of reasons and a record similar to the record presented here).

### 2. Statutory Requirements

{15} We now turn to Regents' contention that the Commission failed to comply with various statutes when it adopted the second sentence of 20.6.4.10.G NMAC. The entire section reads as follows:

G. Human health standards shall apply to those waters with a designated, existing or attainable fishery use. The human health standards for persistent toxic pollutants, as identified in Subsection M of Section 20.6.4.900 NMAC, shall also apply to all tributaries of waters with a designated, existing or attainable fishery use.

20.6.4.10.G NMAC.

{16} Underlying Regents' statutory arguments is their concern that the Commission adopted standards to protect humans from consuming fish detrimental to human health but that the second sentence applies the standards to ephemeral tributaries without fish. Ephemeral tributaries, which contain water infrequently and generally as a result of storms or other precipitation events, are, by definition, unable to support a self-sustaining population of fish.

{17} Regents argue that the Commission failed to designate a use for tributaries, as

required under Section 74–6–4(C) of the Water Quality Act and 33 U.S.C. § 1313(c)(2)(A) of the Clean Water Act. Additionally, they argue that by applying the human health standards to tributaries, the Commission effectively designates to tributaries an unattainable fishery use. Lastly, they argue that the sentence adopted by the Commission is a regulation, as well as a standard, and that the Commission was therefore required to comply with the requirements for adopting regulations under Section 74–6–4(D), which it did not do. As part of the last argument, Regents contend that the Commission failed to provide statutorily required notice under Section 74–6–6(A), (C) when the Commission did not disclose that it would consider a regulation at its March 2002 hearing.

{18} We consider each argument in turn by starting with the language of the statute. If the statute is clear and unambiguous, we apply its plain meaning. *Sims v. Sims,* 1996–NMSC–078, ¶ 17, 122 N.M. 618, 930 P.2d 153. "In construing a statute, we assume that the legislative purpose is expressed by the ordinary meaning of the words used." *Old Abe Co. v. N.M. Mining Comm'n,* 121 N.M. 83, 90, 908 P.2d 776, 783 (Ct.App.1995). When more than one section of a statute is involved, we consider the sections together to give effect to the legislature's intent. *High Ridge Hinkle Joint Venture v. City of Albuquerque,* 1998–NMSC–050, ¶ 5, 126 N.M. 413, 970 P.2d 599. In addition, "in determining [legislative] intent we look to the language used and consider the statute's history and background." *Key v. Chrysler Motors Corp.,* 121 N.M. 764, 768–69, 918 P.2d 350, 354–55 (1996).

{19} We turn now to Regents' first argument, that the Commission must, under state and federal law, designate a use for tributaries in its water quality standards. Section 74–6–4(C) of the Water Quality Act requires the Commission to

adopt water quality standards for surface and ground waters .... The standards shall include narrative standards and as appropriate, the designated uses of the waters and the water quality criteria necessary to protect such uses. The standards shall at a minimum protect the public health or welfare, enhance the quality of water and serve the purposes of the Water Quality Act.

{20} The Clean Water Act stipulates that standards "shall consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses." 33 U.S.C. § 1313(c)(2)(A).

{21} We are somewhat puzzled with Regents' argument that the Commission failed to designate a use for tributaries; the pre-existing water quality standards do designate such a use. The standards protect water quality in ephemeral streams for livestock watering and wildlife habitat uses. 20.6.4.10.A NMAC. The Department initially contended in its answer brief that it could assign criteria without designating a use. At oral argument, however, the Department clarified that the second sentence of 20.6.4.10.G NMAC provides additional protective criteria for the already existing uses of tributaries, as well as adding further protective criteria for waters with designated fishery uses. We observe that the Department's testimony to the Commission also referred to the pre-existing designated uses for tributaries. In light of the existence of these designated uses, we need not further address Regents' contention that a use was not designated or the Department's initial theory that a designation was not required.

{22} If Regents are implying that Section 74–6–4(C) requires the Commission to designate a fishery use for ephemeral tributaries before applying the human health standards to them, we disagree. We find nothing in the plain language of Section 74–6–4(C) or 33 U.S.C. § 1313(c)(2)(A) that prohibits the Commission from protecting waters with fishery uses by applying the standards to tributaries of those waters. Regents conceded as much when they testified they did not believe either the Water Quality Act or the Clean Water Act prohibited the Commission from adopting the criteria for ephemeral streams.

{23} The EPA's approval of 20.6.4.10.G NMAC reinforces our view that the Commission acted properly in adopting the second sentence. In its review of the adopted regu-

lations, the EPA advised the Department that it was within the state's authority under the Clean Water Act to apply the numeric criteria to ephemeral tributaries in order to protect downstream uses. The EPA noted that the tributaries may not support permanent fish populations and observed that although the state's approach is a restrictive one when applied statewide, it is nevertheless legal under the Clean Water Act. The Department informed this Court of the EPA's decision, pursuant to Rule 12–213(D)(2) NMRA 2004. We conclude that based on the plain language of both the state and federal statutes, the Department did not act contrary to § 74–6–4(C) or 33 U.S.C. § 1313(c)(2)(A) when it adopted the second sentence.

{24} Nor do we believe that the Commission has designated a fishery use for tributaries by applying the human health standards to them. As we discussed above, the standards apply livestock watering and wildlife habitat uses to ephemeral tributaries; there is no indication that the Commission has added to those uses.

■ {25} We now turn to Regents' argument that the second sentence is a regulation and that the Commission must therefore comply with Section 76–4–6(D). Section 76–4–6(D) requires the Commission to consider, among other things, the technical practicability and economic reasonableness of a regulation before adopting it. Both parties agree that a standard defines the amount of contaminant in the ambient water and that a regulation defines the conduct necessary for an entity that discharges pollutants to comply with the standard. In this case, the entity is Regents. Regents contend the "substance, character, and effect" of the second sentence define their conduct because the sentence regulates the effluent Regents may discharge from a pipe.

{26} Criteria are not directly applied to a discharge; they are applied to ambient water. The criteria are just a measure for determining water quality in a stream. Regents reason, however, that since ephemeral streams are frequently dry, at most times, the only water in the ephemeral streams will be the effluent released by dischargers. As a result, they assert, the standard will have to be met at the end of the pipe. An effluent is defined in pertinent part as "[a] discharge of liquid waste, as from [a pipe of] a factory or nuclear plant." *The American Heritage Dictionary of the English Language* 570 (4th ed.2000).

{27} We disagree that the second sentence regulates the effluent. As the Department explained, there is quite a distinction between setting water quality standards and setting effluent limits. There is a specific procedure for setting effluent limits for a discharger under the Clean Water Act. Regents' argument discounts that procedure. Any point source discharging a pollutant into a body of water is required to obtain a permit issued by the EPA, in accordance with the National Pollutant Discharge Elimination System (NPDES). Effluent limits for these permits are typically based on the best available technology. After the technology-based effluent limit is set, the EPA considers a state's water quality standards in order to determine whether the effluent limit meets those standards. Only if the technology-based limits are insufficient to meet those water quality standards is the NPDES permit required to be changed to impose more stringent effluent limits. Regents speculated at the hearing that the EPA might alter Regents' NPDES permit to reflect the state's human health standards for tributaries. That the federal government might ultimately impose more stringent effluent limits in Regents' permit does not support a conclusion that the state's standard is consequently a regulation. Regents' argument fails.

{28} Regents further contend that they received inadequate notice under 74–6–6(A), (C) because the Commission failed to disclose in its published notice that a regulation as opposed to a standard would be considered at the hearing. Section 74–6–6 sets forth the notice and hearing requirements, which are the same for standards or regulations. Regents do not dispute that they received direct as well as constructive notice of the petition and hearing. In addition, as noted above, the Department met with Regents prior to the hearing to discuss the proposed amendments. Regents' claim, then, is solely that

the content of the notice failed to indicate a regulation was under consideration. However, we have concluded that the second sentence is not a regulation. Accordingly, we hold that the Commission complied with Section 74–6–6(A), (C).

### C. There Was Substantial Evidence for the Commission's Action

{29} "Substantial evidence supporting administrative agency action is relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Oil Transp. Co. v. N.M. State Corp. Comm'n,* 110 N.M. 568, 571, 798 P.2d 169, 172 (1990); *Wolfley v. Real Estate Comm'n,* 100 N.M. 187, 189, 668 P.2d 303, 305 (1983). We review the whole record, considering evidence both favorable and unfavorable, to determine the sufficiency of the evidence. *Perkins v. Dep't of Human Servs.,* 106 N.M. 651, 654, 748 P.2d 24, 27 (Ct.App.1987). We do not reweigh the evidence but decide, on balance, whether there was substantial evidence to support the agency's decision. *Id.* at 655, 748 P.2d at 28.

{30} At the March 2002 hearing, the Department emphasized that the purpose of the human health criteria is to protect humans from consuming fish "with toxic pollutants in their flesh." The Department clarified that the second sentence in 20.6.4.10.G NMAC only applies to fifteen pollutants, "the very worst of the worst of the toxic chemicals." "There is no good reason to release any of these [fifteen pollutants] into the watersheds of the state," the Department told the Commission. The Department testified that these persistent toxic pollutants pose a substantial risk over many lifetimes—that they adhere to sediments in ephemeral streams and are transported downstream to waters containing fish consumed by humans. The smallest sediments, which tend to pick up the greatest number of these contaminants, are most easily moved downstream. Some of the pollutants are bioaccumulative; that is, they "accumulate in fish, which absorb them from the water and the aquatic organisms which they eat, who in turn have absorbed them from the water column and from the sediments. Over time, these pollu-

tants bioaccumulate to concentrations which are dangerous to humans [who] consume the fish." Many of the ephemeral tributaries contain aquatic organisms but generally do not contain fish consumed by humans.

{31} The Department presented data from the EPA that showed the presence of twenty priority toxic pollutants in effluent discharges, including DDT. The Department also presented its findings of high levels of PCBs and dioxin in ephemeral storm waters on LANL property and in fish caught in Cochiti Reservoir. While clarifying that it was not implying a causal relationship between the presence of the pollutants in these two locations, the Department indicated that the findings show the pollutants currently exist in both ephemeral streams and in fishery waters. The Department testified that the second sentence was designed to ensure that certain highly persistent toxics do not reach fishery waters. The Department further explained the inadequacy of the current strategies to control these toxics and that "a different strategy is needed" for persistent toxic pollutants. That strategy, the Department stated, is applying numeric criteria for persistent toxic pollutants to the tributary itself.

{32} Regents countered that existing programs, including the issuance of storm water permits, are effective tools to protect downstream fishery waters; the tools just need to be utilized to the fullest extent possible. However, according to the Department, the existing approaches only apply when discharges routinely reach downstream waters. The Department explained that these approaches create "a very large loophole in the standards" because they exclude discharges that reach the downstream waters during storms or other runoff events. Regents also insisted that the Department's findings of persistent toxic pollutants rely "on a very narrow and sparse data set," which can have biased results; Regents requested further data and study. It stated that although PCBs have been found in fish, the level of the toxic is not harmful to human health.

{33} As an alternative to a blanket application of the numeric criteria to tributaries, Regents urged the Department to wait until

it finds a risk to human health in fishery waters, then find the source of the problem and work with the discharger to come to a solution. Regents agreed their approach could be described, in their words, "as waiting until the horse is out of the barn before you deal with the problem." They acknowledged that while studies are pursued, precipitation events continue and rainfall runoff flows down from an ephemeral stream on their property to a fishery water. Regents also conceded that it is essentially a policy choice for the Commission whether to accept their approach to protecting downstream uses or to adopt the Department's approach.

{34} We reiterate that in reviewing for substantial evidence, although we consider the evidence on both sides of the issue, we affirm if there is substantial evidence supporting the Commission's decision. We find in the whole record ample evidence to affirm.

### D. The Commission's Action Was Not Arbitrary or Capricious

{35} An action is arbitrary or capricious if it is "unreasonable, irrational, wilful, and does not result from a sifting process." *Oil Transp. Co.*, 110 N.M. at 572, 798 P.2d at 173. We may find an action arbitrary or capricious if there is "no rational connection between the facts found and the choices made." *Colonias Dev. Council v. Rhino Envtl. Servs., Inc.*, 2003–NMCA–141, ¶ 5, 134 N.M. 637, 81 P.3d 580 (internal quotation marks and citation omitted), *cert. granted*, 2003–NMCERT–003, 135 N.M. 52, 84 P.3d 669; *Perkins*, 106 N.M. at 655, 748 P.2d at 28. Even if a different conclusion might have been reached from the facts, the choice made "is not arbitrary or capricious if exercised honestly and upon due consideration." *Id.*

{36} We do not find the adoption of the second sentence arbitrary or capricious. The Commission made the decision to adopt the sentence after evidence was presented that persistent toxic pollutants exist in ephemeral streams in New Mexico, that these pollutants may flow into fishery waters as a result of storms or other precipitation events, and that the pollutants in sufficient quantities are harmful to human health. We find the decision to adopt the sentence both reasoned and rational; that there were possibly other choices available to the Commission to protect downstream waters from persistent toxic pollutants does not make the decision arbitrary or capricious.

### III. CONCLUSION

{37} We affirm the Commission's adoption of the second sentence of 20.6.4.10.G NMAC, which applies the human health standards to tributaries of fishery waters.

{38} **IT IS SO ORDERED.**

ALARID and VIGIL, JJ., concur.