2006-NMCA-115

143 P.3d 502

**PHELPS DODGE TYRONE, INC., Plaintiff–Appellant,**

v.

**NEW MEXICO WATER QUALITY CONTROL COMMISSION and New Mexico Environment Department, Defendants–Appellees.**

No. 25,027.

Court of Appeals of New Mexico.

July 19, 2006.

Certiorari Denied, No. 29,963, Sept. 5, 2006.

Certiorari Denied, No. 29,962, Sept. 11, 2006.

Modrall, Sperling, Roehl, Harris & Sisk, P.A., John J. Kelly, Stuart R. Butzier, Albuquerque, NM, Gallagher & Kennedy, P.A., Dalva Moellenberg, Phoenix, AZ, for Appellant.

Patricia A. Madrid, Attorney General, Zachary A. Shandler, Assistant Attorney General, Santa Fe, NM, for Appellee New Mexico Water Quality Control Commission.

Charles de Saillan, Assistant General Counsel, Tannis L. Fox, Deputy General Counsel, Santa Fe, NM, for Appellee New Mexico Environment Department New Mexico Environmental Law Center.

Roderick Ventura, Douglas Meiklejohn, Sarah Piltch, Eric Jantz, Santa Fe, NM, for Amicus Curiae, Gila Resources Information Project.

Comeau, Maldegen, Templeman & Indall, LLP, Jon J. Indall, Stephen J. Lauer, Sharon W. Horndeski, Santa Fe, NM, for Amicus Curiae New Mexico Mining Association.

Patricia A. Madrid, Attorney General, Karen L. Fisher, Assistant Attorney General, Judith Ann Moore, Assistant Attorney General, Santa Fe, NM, for Amicus Curiae State of New Mexico.

## OPINION

WECHSLER, Judge.

{1} The opinion filed in this case on June 15, 2006 is hereby withdrawn and the following substituted therefor. The joint motion for rehearing of the New Mexico Water Control Commission and the New Mexico Environment Department is denied.

{2} This appeal concerns a groundwater discharge permit, No. DP–1341, issued by the New Mexico Environment Department (NMED) to Phelps Dodge Tyrone, Inc.,[1] and raises important issues under the Water Quality Act, NMSA 1978, §§ 74–6–1 to –17 (1967) (amended 2005) (the Act).[2] The permit requires Tyrone to take certain steps when mining operations are completed at its Tyrone copper mine. Among other things, the permit requires Tyrone to regrade its leach ore and waste rock piles to slopes no steeper than 3:1 and to completely cap the piles with three feet of alluvium (i.e., silt, clay, gravel, or similar material). The Water Quality Control Commission upheld these conditions. Tyrone contends that NMED has no authority to impose these conditions and that the conditions are invalid because NMED and the Commission misinterpreted the Act. Tyrone also raises several due process issues related to the composition of the Commission and conduct of the Commission hearing.

{3} We hold that NMED has the authority to impose reasonable permit conditions. However, we hold that the Commission failed to use a proper analysis in determining whether the conditions are reasonable and remand for further, limited proceedings. We also hold that Tyrone's due process claims do not require reversal.

## BACKGROUND

### A. THE TYRONE MINE

{4} Some context is required to understand the permit conditions and the issues presented by this appeal. The Tyrone mine

---

1. We use *"Tyrone"* throughout the opinion to refer to Plaintiff in this case. We refer to Tyrone's parent company as "Phelps Dodge."

2. We cite the current version of the Act because recent amendments do not affect the issues in this case.

is extremely large. It covers approximately 9400 acres and includes eight open mining pits and six pits that were previously mined. The main pit is 1400 feet deep. Waste rock from the pit excavations has been deposited in piles near and adjacent to the open pits. Leachable-grade ore has also been placed in stockpiles near and adjacent to the pits. The leach ore stockpiles and waste rock piles cover approximately 2800 acres and contain about 1.7 billion tons of rock.

{5} Tyrone leaches the stockpiles by placing acidic leach solution on the tops and sides of the piles. The solution percolates through the piles and dissolves the copper, and the resulting pregnant leach solution is then collected at the stockpile toes. The solution is then pumped to a solvent extraction and electrowinning plant where the copper is removed from the solution.

{6} The process of mining copper produces acid drainage that significantly and adversely affects groundwater. Piles continue to create acid drainage for hundreds of years after mining has ceased, as the piles are exposed to water and oxygen.

## B. THE PERMIT

{7} The permit imposes requirements on Tyrone's mine closure and contains 117 conditions. Tyrone challenges conditions 4 and 17. Condition 4 requires Tyrone to "regrade all Waste Rock Pile and Leach Ore Stockpile slopes to interbench slopes of no steeper than 3:1 (horizontal: vertical)." Condition 17 requires Tyrone to cover all waste rock and leach ore piles and tailing impoundments with at least three feet of approved non-acid generating alluvium. Other conditions require Tyrone to establish vegetation on the covers. The reason for these conditions is that, according to NMED's experts, a three-foot soil cover, on which vegetation is established, acts as a cover that keeps precipitation from infiltrating the piles and then creating acid drainage. These conditions have been referred to as "source control" because they greatly reduce acid drainage at its source, the piles. The Commission affirmed these conditions.

{8} Tyrone believes that these conditions are overly burdensome and unlawful. At the evidentiary hearing before the Commission, Tyrone offered its own method, the "open-pit capture zone." An open-pit capture zone is an area into which all groundwater flows, and is then captured, instead of flowing into the regional aquifer. Under this method, the open pits naturally catch contaminated water, which is then pumped out and treated. Pumping and treating would occur over a period of approximately one hundred years. According to Tyrone, this method does not require Tyrone to regrade the piles to the same extent and limits the covers that will be required. Tyrone proposes to cover only some of the piles, to cover with two feet of material, and to cover the tops of the piles but not the sides.

{9} NMED's expert testified that Tyrone's method was flawed for several reasons. He indicated that the pit capture zone might only protect one aquifer, while another aquifer became contaminated and allowed the contamination to move offsite. In addition to that problem, he indicated that there existed uncertainty about the actual location of the pit capture zone. Finally, NMED's expert testified that if contamination still exists after the pumping and treatment stop, nothing would prevent it from moving offsite and contaminating water elsewhere. The Commission denied Tyrone's appeal and upheld the permit conditions.

## STANDARD OF REVIEW

{10} Under the Act, we set aside an action of the Commission only if it is "(1) arbitrary, capricious or an abuse of discretion; (2) not supported by substantial evidence in the record; or (3) otherwise not in accordance with law." Section 74–6–7(B)(1)– (3); *Regents of the Univ. of Cal. v. N.M. Water Quality Control Comm'n*, 2004– NMCA–073, ¶8, 136 N.M. 45, 94 P.3d 788. "An action is arbitrary or capricious if it is unreasonable, irrational, wilful, and does not result from a sifting process" or "if there is no rational connection between the facts found and the choices made." *Regents of the Univ. of Cal.*, 2004–NMCA–073, ¶35, 136 N.M. 45, 94 P.3d 788 (internal quotation marks and citations omitted).

## NMED'S AUTHORITY TO IMPOSE REASONABLE PERMIT CONDITIONS

{11} The first issue we address is whether NMED may include conditions that

specify the methods of controlling pollution in a discharge closure permit when those conditions were not proposed by the applicant. Because NMED's authority is derived from statute, we review this issue de novo. *See Morgan Keegan Mortgage Co. v. Candelaria*, 1998–NMCA–008, ¶ 5, 124 N.M. 405, 951 P.2d 1066 (applying de novo review to construction of a statute). We give little or no deference to agencies engaged in statutory construction because they have no expertise in that area. *Pub. Serv. Co. of N.M. v. N.M. Pub. Util. Comm'n*, 1999–NMSC–040, ¶ 14, 128 N.M. 309, 992 P.2d 860.

{12} Tyrone argues that the Act limits NMED's authority to impose permit conditions and that the Act does not authorize the conditions Tyrone challenges in this case. Tyrone relies on two sections of the Act. First, it relies on Section 74–6–4(D), which states that regulations adopted by the Commission may not specify the method to be used:

> Regulations *shall not specify the method to be used to prevent or abate water pollution* but may specify a standard of performance for new sources that reflects the greatest reduction in the concentration of water contaminants that the commission determines to be achievable through application of the best available demonstrated control technology, processes, operating methods or other alternatives, including where practicable a standard permitting no discharge of pollutants.

(Emphasis added.) Second, it argues that NMED may only impose the conditions listed in Section 74–6–5(J). That section provides that "[b]y regulation, the commission may impose reasonable conditions upon permits requiring permittees" to take various steps dealing with monitoring, sampling, and reporting of water quality. *Id.*

{13} Reading these two sections together, Tyrone argues that the legislature has expressed its intention that NMED and the Commission may impose a standard of water quality, but may not dictate to an operator the specific method to be used to meet that standard. Tyrone argues that Section 74–6–5(J) strictly limits permit conditions to those addressing monitoring, sampling, and providing information. It also argues that Section 74–6–5(D) addresses only the authority of the Commission to regulate the time periods for processing and acting on permits.

{14} NMED and the Commission argue that the statutes relied on by Tyrone demonstrate that the legislature intended them to have broad power and flexibility to carry out their mission. They rely on Section 74–6–5(D), which reads:

> The commission shall by regulation set the dates upon which applications for permits shall be filed and designate the time periods within which the constituent agency shall, after the filing of an administratively complete application for a permit, either grant the permit, grant the permit subject to conditions or deny the permit.

{15} As a general matter, we agree with Tyrone that NMED's authority must be derived from statute. *See In re Application of PNM Elec. Servs.*, 1998–NMSC–017, ¶ 10, 125 N.M. 302, 961 P.2d 147. We therefore address NMED's authority under the Act as an issue of legislative intent. *See Key v. Chrysler Motors Corp.*, 121 N.M. 764, 768–69, 918 P.2d 350, 354–55 (1996). The "plain language of a statute is the primary indicator" of such intent, and we refrain from further interpretation if the language is clear and unambiguous. *High Ridge Hinkle Joint Venture v. City of Albuquerque*, 1998–NMSC–050, ¶ 5, 126 N.M. 413, 970 P.2d 599 (internal quotation marks and citation omitted); *see Sims v. Sims*, 1996–NMSC–078, ¶ 17, 122 N.M. 618, 930 P.2d 153. However, we reject the literal language of a statute when its plain language would make its application absurd or unreasonable. *Medina v. Berg Constr., Inc.*, 1996–NMCA–087, ¶ 26, 122 N.M. 350, 924 P.2d 1362. We attempt to harmonize statutes "in a way that facilitates their operation and the achievement of their goals." *State ex rel. Quintana v. Schnedar*, 115 N.M. 573, 575–76, 855 P.2d 562, 564–65 (1993).

{16} In the context of the Act, we agree with NMED that Section 74–6–5(D) provides the authority to impose the permit conditions at issue. Generally, the Act grants the Commission the authority to issue

regulations that are to be carried out by the Commission and its constituent agencies. Section 74–6–4. The Act allows the Commission to adopt regulations requiring that permits for discharge of a water contaminant be obtained from a constituent agency. Section 74–6–5(A). With regard to a permit, however, the Act grants authority directly to constituent agencies. A constituent agency may require an applicant to submit data selected by the constituent agency and may deny a permit application if the constituent agency makes certain findings. Section 74–6–5(C), (E). Section 74–6–5(D) addresses the authority of a constituent agency to grant a permit. No other section does so. When we read Section 74–6–5(D) in the context of surrounding subsections that grant constituent agencies authority to require information in connection with an application and deny an application if it is inappropriate, it becomes apparent that Section 74–6–5(D) contains the legislative authority to a constituent agency to grant an application for a permit. *See Quintana*, 115 N.M. at 575–76, 855 P.2d at 564–65. This authority is distinct from the authority given the Commission to act by regulation. We therefore disagree with Tyrone that Section 74–6–5(D) only grants the Commission authority to regulate the time for processing and acting on permits.

{17} In connection with its authority to grant a permit, the plain language of Section 74–6–5(D) allows a constituent agency to attach conditions to the permit. Accepting this language, Tyrone contends that this statutory authority refers solely to the conditions listed in Section 74–6–5(J) concerning monitoring, sampling, and reporting. We do not read Section 74–6–5(D) to have such a limitation. First, as we have observed, Section 74–6–5(D) contains express authority that is granted directly to constituent agencies in connection with the permit process. In contrast, Section 74–6–5(J), by its express language, grants authority to the Commission, not to constituent agencies.

{18} Additionally, Section 74–6–5(D) does not refer to Section 74–6–5(J) or in any way state that the Section 74–6–5(J) conditions are the only conditions that may be imposed. If the legislature intended that NMED have only the power to impose the conditions in Section 74–6–5(J), it knew how to clearly impose such a limitation. We believe that the failure to express such a limitation indicates the legislature's intent that NMED should retain sufficient discretion to carry out its mission. *See Rio Grande Chapter of the Sierra Club v. N.M. Mining Comm'n*, 2003–NMSC–005, ¶ 27, 133 N.M. 97, 61 P.3d 806 (noting that "[i]f the legislature intended to prohibit the expansion of a permit area, it certainly could have expressly stated so," but the Mining Act did not contain such a restriction).

{19} We further do not consider Section 74–6–5(D) to be limited by Section 74–6–5(J) because of the distinction between permits and regulations that we consider significant to our interpretation of the Act. This distinction also bears on our analysis of Tyrone's argument that Section 74–6–4(D) prohibits NMED from specifying the method for Tyrone to use for pollution control. There is a distinction between permits and regulations with regard to scope. Regulations, by their nature, are general requirements. They are designed to apply to all situations and can apply to any site. In contrast, a constituent agency's action in connection with a permit application is specific to the site in the application. It is designed to address the circumstances of the particular site.

{20} For example, Section 74–6–4(D) deals only with regulations adopted by the Commission. Tyrone is correct that under Section 74–6–4(D) regulations shall not specify the method to be used to meet water quality standards. Tyrone reads this language to mean that NMED and the Commission may impose water quality standards, but have no power to impose a particular method to meet those standards. The Mining Association characterizes this legislative scheme as meaning that companies are given the power to select the method of pollution control, and NMED's role is limited to giving "thumbs up or down."

{21} But there is a sensible reason why the legislature would draw a distinction between permit conditions and regulations. The legislature did not want regulations to specify a particular method because it under-

stood the inflexibility in specifying a particular method in a regulation. Section 74–6–4(D) illustrates the legislature's intention to avoid a required approach and, instead, to grant flexibility in determining the appropriate method to use for each site. Section 74–6–4(D) is consistent with the idea that each site is unique, different in scale, different in impact, and different in geology and hydrology. The unique nature of a site requires flexibility for both operators and regulators. This need for flexibility explains the legislature's intent that regulations not dictate a specific method to be used in all situations. Consequently, we believe that Section 74–6–4(D) and Section 74–6–5(J) can be harmonized with Section 74–6–5(D) in a sensible way to facilitate their operation and to achieve the goals of the Act. *See Cerrillos Gravel Prods., Inc. v. Bd. of County Comm'rs*, 2005–NMSC–023, ¶ 11, 138 N.M. 126, 117 P.3d 932; *Quintana*, 115 N.M. at 575–76, 855 P.2d at 564–65.

{22} Similarly, Section 74–6–5(J) addresses the authority of the Commission to act by regulation. The conditions listed in Section 74–6–5(J) are general requirements that can apply to any site. We believe that in adopting Section 74–6–5(J) the legislature wanted to emphasize the importance of monitoring, sampling, and reporting by allowing the Commission to impose these conditions through regulation. When interpreted in harmony with Sections 74–6–4(D) and 74–6–5(D), Section 74–6–5(J) is a grant of authority, not a limitation.

{23} The Mining Association further encourages us to interpret the Act to allow industry to select the methods necessary, assuring us that its members view "environmental stewardship as a critical component of their respective business missions, with the primary imperative of ensuring that their operations do not pose an unacceptable health risk to employees and neighbors." Allowing industry to select the method of pollution control, and limiting NMED to granting or denying a permit, is one choice the legislature could have made. That choice, however, does not necessarily advance the Act's purpose of protecting ground and surface water from pollution, and, from the language of Section 74–6–5(D), we do not believe that the legislature chose that path. *See Bokum Res. Corp. v. N.M. Water Quality Control Comm'n*, 93 N.M. 546, 555, 603 P.2d 285, 294 (1979) (affirming an agency interpretation of the Act because it was not "clearly incorrect" given the objective of preventing water pollution). Rather, the intent of the legislature as described in the purposes of the Act is best achieved if NMED is an active participant in imposing conditions and in addressing identified problems. *See State ex rel. Helman v. Gallegos*, 117 N.M. 346, 353, 871 P.2d 1352, 1359 (1994) (stating that statutes should be interpreted to achieve the legislature's purpose). Although NMED has the ultimate power to deny a permit if it does not agree with the method selected by the operator, such power does not remove NMED's need to impose permit conditions, as Tyrone argues, because of the inefficiency attendant to such a process.

{24} For these reasons, we conclude that NMED's construction of the Act is supported by the legislature's expression that the "constituent agency" may "either grant the permit, grant the permit *subject to conditions* or deny the permit." Section 74–6–5(D) (emphasis added). Consequently, we hold that the Act grants NMED the power to impose reasonable permit conditions. That interpretation is consistent with the plain language of the Act and advances its underlying policies. Our interpretation of the Act gives NMED power, but it is not unchecked power. NMED's imposition of conditions is not final. An aggrieved party may always appeal to the Commission and to our appellate courts. These avenues of review provide an incentive for the NMED to craft permit conditions that are reasonable and that can withstand review.

## REASONABLENESS OF PERMIT CONDITIONS

{25} Although we are not bound by an agency's interpretation of statutes and rules because "it is the function of the courts to interpret the law," *Sierra Club*, 2003–NMSC–005, ¶ 13, 133 N.M. 97, 61 P.3d 806 (internal quotation marks and citation omitted), we afford administrative agencies considerable discretion to carry out the purposes

of their enabling legislation, *see id.* ¶ 25, and we give deference to an agency's interpretation of its own regulations. *See Morningstar Water Users Ass'n v. N.M. Pub. Util. Comm'n,* 120 N.M. 579, 583, 904 P.2d 28, 32 (1995).

{26} Tyrone argues that it is impossible to determine the reasonableness and effectiveness of the permit conditions if points of compliance have never been established and that neither NMED nor the Commission ever selected points where the effectiveness of the permit conditions could be measured. Tyrone further contends that the Commission's decision that the "Tyrone mine facility" is the "place of withdrawal ... for present or reasonably foreseeable future use" cannot stand because an entire mine site cannot be a "place of withdrawal" and that the Commission's denominating the entire mine site as the relevant measuring point requires Tyrone to meet water quality standards at every place on the mine site. Section 74–6–5(E)(3). It argues that, taken to its extreme, this case sets precedent requiring industry to ensure that water at the bottom of a huge mine pit will be drinkable and that the legislature could not have intended such an impractical result. Tyrone asserts that this overly broad and incorrect interpretation of the water to be protected under the Act in turn led the Commission into an incorrect determination that the permit conditions were reasonable and lawful.

{27} Tyrone's argument requires us to consider the legislature's intent in using the phrase "at any place of withdrawal of water for present or reasonably foreseeable future use" in Section 74–6–5(E)(3). The phrase is one of "beguiling simplicity." *Helman,* 117 N.M. at 353, 871 P.2d at 1359 (recognizing that the language of a statute, "apparently clear and unambiguous on its face, may ... give rise to legitimate ... differences of opinion concerning the statute's meaning"). Certainly, the legislature meant to capture the concept that clean water that is currently being withdrawn for use, or clean water that is likely to be used in the reasonably foreseeable future, must be protected. When the Commission was grappling with the meaning of the phrase, one commissioner's apt comment was that "we are darn sure obligated to make sure that the water that isn't contaminated outside of [the currently contaminated] area is protected."

{28} The standard chosen by the legislature is necessarily broad and simple in the abstract. The problem is that it is difficult to apply to a situation such as the one before us, and the standard's apparent simplicity leads to genuine uncertainty about the legislative intent for a site like Tyrone. *See id.* (stating that a seemingly clear statute may present genuine uncertainty about the legislature's goal). For example, it raises the question in this case as to the point at which the legislature intended to measure compliance for a mine like Tyrone. That is, should water quality be measured at the bottom of a waste rock pile, at the bottom of the mine pit, at wells located at the perimeter boundary of the mine property, or at some other point or points?

{29} This difficult question is essential to this appeal. The critical phrase suggests that the legislature meant for impacts to be measured in a practical and sensible fashion, but the issue is complicated by the fact that groundwater and surface water systems are interconnected. Contaminated waters migrate into areas that were previously pristine. We have no doubt that the legislature intended to limit that kind of migration. On the other hand, mining is a necessary and important component of our economy and our modern way of life. We believe that the legislature intended that our laws, regulations, and any interpretation of them, strike a wise balance between these competing interests. *Cf.* NMSA 1978, § 69–36–2 (1993) (recognizing that mining is vital to the welfare of New Mexico); § 74–6–4(D) (stating that, in adopting regulations, the Water Quality Commission should consider, among other things, the economic impact of the regulations); *Sierra Club,* 2003–NMSC–005, ¶ 28, 133 N.M. 97, 61 P.3d 806 (stating that "the overall purpose of the Mining Act [is] to strike a balance between the economic and environmental impacts of mining").

{30} NMED tailored its Commission presentation to meet the broad standard of Section 74–6–5(E)(3). During closing argument,

NMED argued that the "Tyrone Mine" is a place of withdrawal because the mine currently obtains potable water from on-site wells, the Fortuna wells. NMED also argued that reasonably foreseeable future use was established because there are fifty domestic wells within a two-mile radius of the mine. It argued that the post-mining use of the mine site would be wildlife habitat and industrial use and that the industrial use would require potable water. NMED also noted that the issue was not a "point" of compliance, because wells can draw contaminated water from a large area around the well. NMED counsel argued, "So when we talk about a place of withdrawal, we don't mean one dot on a facility map." On appeal, the attorney general makes a similarly broad statement that "[t]he mine site is a place of withdrawal of water for present use, because Tyrone currently uses ground water pumped from the mine property."

{31} The Commission had difficulty deciding the meaning of the standard, and the transcript of the Commission's deliberations reveals the ambiguity of the critical phrase. One commissioner said that the Commission had to ensure that "the water that isn't contaminated outside of that area is protected." That general assessment appears correct, but applying the test to the Tyrone mine proved difficult. The transcript of the deliberations reflects that the commissioners could not agree on whether a point of compliance had to be selected and that they admitted they were unsure whether the place of withdrawal was the entire mine site, or just certain points.

■ {32} In the end, the commissioners' divergent interpretations of the statute were never satisfactorily reconciled. The Commission ended up voting ten to one on a motion stating that "there is present and reasonably foreseeable future use of water on the Tyrone Mine facility." The Commission accepted NMED's arguments and entered them as findings. The Commission then relied on all of these facts to reach its conclusion that the "Tyrone Mine Facility" was a place of withdrawal of water for present or future use. This decision could not have been more broad. As an indication of the overbreadth

of the standard that may have been applied by the Commission, at the evidentiary hearing there was evidence that it was "possible" that someday someone might drill a well into the side of, or adjacent to, waste rock piles. The Commission relied, in part, on this possibility to support its conclusion that the entire facility was a place of withdrawal of water. This speculative scenario appears to stretch the statutory language too far, does not appear to represent reasonable future use, and cannot support the conclusion that the entire facility is a place of withdrawal of water. *See Sierra Club*, 2003–NMSC–005, ¶ 17, 133 N.M. 97, 61 P.3d 806.

■ {33} The potential environmental impacts from a mine the size of Tyrone are enormous, both in scope and duration. Although the mine is a place where water is withdrawn for present use, it would be incorrect to conclude that, as a consequence, the entire mine is a measuring point and must meet water quality standards everywhere. Not only is such a conclusion overbroad, it is also unrealistic to require all water at the Tyrone mine site to meet drinkable water standards. *See Medina*, 1996–NMCA–087, ¶ 26, 122 N.M. 350, 924 P.2d 1362. Thus, even though it is a conclusion that is arguably within the plain language of the statute, we reject such a broad and impractical interpretation of the Act; so interpreted, it would not reflect a balance between the competing policies of protecting water and yet imposing reasonable requirements on industry. *Cf.* § 74–6–4(D); *Sierra Club*, 2003–NMSC–005, ¶ 28, 133 N.M. 97, 61 P.3d 806 (stating that the New Mexico Mining Act attempts "to strike a balance between the economic and environmental impacts of mining"). A conclusion reached using an overly broad legal standard is arbitrary and capricious and not in accordance with law. *See Archuleta v. Santa Fe Police Dep't*, 2005–NMSC–006, ¶ 18, 137 N.M. 161, 108 P.3d 1019 (stating that a ruling that is not in accordance with the law should be reversed "if the agency unreasonably or unlawfully misinterprets or misapplies the law"); *Atlixco Coalition v. Maggiore*, 1998–NMCA–134, ¶ 24, 125 N.M. 786, 965 P.2d 370 (stating that "an agency's action is arbitrary and capricious if it pro-

vides no rational connection between the facts found and the choices made, or entirely omits consideration of relevant factors or important aspects of the problem at hand").

{34} We understand the Commission's struggle to determine the meaning of the statute and the contours of its task that ultimately resulted in its overly broad and impractical conclusion. The legislative standard is broad and there are no regulations providing any interpretive guidance. Our review of the transcript indicates that the Commission worked diligently to decide all aspects of this complex case. Unfortunately, the statute and existing regulations did not give the Commission adequate information about the decision it was obligated to make.

{35} We believe the appropriate course is to reverse the Commission's decision only as to conditions 4 and 17 and to remand for further, limited proceedings. *See High Ridge Hinkle Joint Venture v. City of Albuquerque,* 119 N.M. 29, 39–40, 888 P.2d 475, 485–86 (Ct.App.1994) (suggesting that remand to an administrative agency, and deference to the agency, is warranted when the agency's knowledge and expertise play a role in the decision-making process); *cf. McDowell v. Napolitano,* 119 N.M. 696, 700, 895 P.2d 218, 222 (1995) (recognizing that, under the doctrine of comity, a "court may choose to defer to the administrative agency where the interests of justice are best served by permitting the agency to resolve factual issues within its peculiar expertise"). Because the Commission made findings of fact and conclusions that the entire mine is a place of withdrawal for the purposes of Section 74–6–5(E)(3), we must assume that it considered its findings and conclusions to affect its determination to affirm the conditions. The Commission, in the first instance, must create some general factors or policies to guide its determination. We offer no opinion as to whether the Commission should do so by way of rulemaking or by simply deciding the factors as a part of this specific case, or both.

{36} We discuss some possible factors that the Commission might consider. As a court, we are hampered in this task because we do not have technical expertise in hydrology, geology, or other applicable scientific topics.

*See State ex rel. Norvell v. Ariz. Pub. Serv. Co.,* 85 N.M. 165, 172, 510 P.2d 98, 105 (1973) (noting that it is unrealistic to assume that appellate judges can unravel complex scientific issues, and therefore such matters are better left to agencies with special expertise). However, the unique geology and hydrology of the area and the particular site (including the mining or other operations and its scale) may be appropriate factors. A federal EPA regulation, 40 C.F.R. § 264.95(a) (2005), defining a point of compliance as "a vertical surface located at the hydraulically downgradient limit of the waste management area that extends down into the uppermost aquifer underlying the regulated units" also may be appropriate for consideration insofar as it addresses the spread of contamination into groundwater outside the mine boundary. In this connection, we note that, although we share Tyrone's and the Mining Association's concern that water at the bottom of a mine pit should not have to be drinkable, we do not necessarily agree with the Mining Association's position that water "underneath" a mine site need not be protected. We can conceive of a situation in which an aquifer underneath a mine site may be negatively impacted, and consequently it might be appropriate to protect that water.

{37} Additionally, at this point we decline to adopt the standard as "point of compliance," or to engage in the wholesale adoption of cases and federal regulations dealing with "point of compliance." It is possible that "point of compliance" is a reasonable proxy for "any place of withdrawal ... for present or reasonably foreseeable future use," Section 74–6–5(E)(3), and that authorities dealing with "point of compliance" can and should be used in a case like this one. However, there may be reasons, such as differences in statutory language, that may make federal law or law from other jurisdictions inapplicable or inappropriate in New Mexico. These arguments were not well developed below or on appeal. Further, our opinion does not preclude the Commission, on remand, from reaching the same result that it previously reached and affirming conditions 4 and 17. *See High Ridge Hinkle Joint Venture,* 119 N.M. at 40, 888 P.2d at 486 (stating that "[a]

decision identical to the original decision may well be affirmable, but because the process ... is of high importance, sometimes it is the process ... that justifies remand and reconsideration"). Moreover, NMED may demonstrate that Section 74-6-5(E)(3) does not affect the permit's closure conditions—an issue that was not before us. The Commission may adopt appropriate factors to guide its discretion, apply them, and conclude that NMED has established reasonable conditions that are based on a reasonable place, or reasonable places, of withdrawal. The Commission may want to take additional evidence addressing the issue of a reasonable place or places of withdrawal and may want to accept briefing and legal argument, but we leave such a determination to the Commission's discretion.

{38} On the record before us, however, we cannot affirm conditions 4 and 17. We reject an interpretation that is so broad that if there is any potable water being used at the mine then the entire mine site is a "place of withdrawal" and therefore NMED may impose any permit requirements to protect every drop of water at the mine facility.

**FAIRNESS OF THE HEARING**

{39} Tyrone argues several reasons why the Commission hearing was unfair and violated due process. It claims that Commissioner Maxine Goad should have been disqualified because of bias and that Commissioner Greg Lewis should have been disqualified because he had prior knowledge about the technical issues presented at the site. Additionally, it claims that a number of changes in the composition of the Commission between the time of the evidentiary hearing, including a change in the Chair, and the deliberations that occurred months later require reversal. Finally, it raises a claim that Commissioner Jim Norton may have been unduly influenced.

{40} "At a minimum, a fair and impartial tribunal requires that the trier of fact be disinterested and free from any form of bias or predisposition regarding the outcome of the case." *Reid v. N.M. Bd. of Exam'rs in Optometry,* 92 N.M. 414, 416, 589 P.2d 198, 200 (1979) (noting that this due

process requirement also prohibits the appearance of bias and that it applies even "more strictly" to administrative tribunals). We review due process claims de novo. *See Cordova v. LeMaster,* 2004-NMSC-026, ¶ 10, 136 N.M. 217, 96 P.3d 778.

**A. COMMISSIONER BIAS**

{41} Tyrone contends that Commissioner Goad's bias infected the Commission's decision. It argues that, as a member of the Sierra Club's mining committee, she had previously taken a position, in another case and in another forum, that demonstrated her bias against Phelps Dodge. Specifically, Tyrone argues that Commissioner Goad had participated, as a Sierra Club representative, at a hearing in December 2002 before the New Mexico Mining Commission. That hearing involved Phelps Dodge's failure to have a closeout permit. Tyrone asserted that its motion to disqualify Commissioner Goad had nothing to do with the fact that she was a member of the Sierra Club, but was made because she took a position unfavorable to Phelps Dodge in the Mining Commission hearing. The Commission denied Tyrone's request to disqualify Commissioner Goad. Resolution of this claim requires a consideration of its context. The composition of the Commission is statutory. *See* § 74-6-3(A). It includes various agency heads (or their designees) and three public members appointed by the Governor. By design, the Commission represents a variety of philosophies and perspectives, and it is common for the Governor to appoint public members with different backgrounds in order to create balance and to give various groups a voice.

{42} In selecting public members, the Governor will likely select those members from pools consisting of people who have been politically and publicly active, people from industry, and people who have expressed their views and who have been engaged in the regulatory process. It is unrealistic to expect that the public members will be people who have not taken positions, or people who come "with a clean slate." *Las Cruces Prof'l Fire Fighters v. City of Las Cruces,* 1997-NMCA-031, ¶ 26, 123 N.M. 239, 938 P.2d 1384 (noting that members of courts

and agencies "cannot avoid having histories or opinions [and] may well have been selected for their offices in part on that basis"). Commissioner Goad was an active member of the Sierra Club and had a certain philosophy on environmental issues. Those facts alone would not disqualify her. *See id.* ¶ 29 (stating that "[m]embers of tribunals are entitled to hold views on [policies] that are pertinent to the case").

{43} According to Tyrone, during the December 2002 Mining Commission meeting, Commissioner Goad had ratified statements made by her fellow Sierra Club panel member, Mr. Larson, that Phelps Dodge should be required to post a cash bond (to guarantee that the closeout plan would be carried out if the company was unable to do so itself), that a parent company guarantee does not suffice under the law, and that Phelps Dodge had made a number of "untrue or unwarranted" assertions. Tyrone also claims that Commissioner Goad had ratified statements, made by Mr. Larson, to the effect that Phelps Dodge had not acted in good faith during the Mining Commission proceeding, had mischaracterized the discussions that had taken place previously, and was not to be trusted.

{44} The prior proceeding involved a failure to meet the deadline for submitting a closeout plan under the Mining Act. The Sierra Club naturally took the position that Phelps Dodge's failure to meet a statutory deadline was unacceptable. Any reasonable person could legitimately take the position that a mining company should comply with deadlines set by the legislature. We do not agree that taking such a position indicates bias sufficient to warrant disqualification.

{45} Tyrone also relies on the statements suggesting that Phelps Dodge had not acted in good faith and was not to be trusted. It is difficult to evaluate the statements without having the precise context. The statements may indicate a deep-seated animosity, may be nothing more than hyperbole, or may be supported by facts and be accurate. In any event, even if the statements are taken at face value, they were made by Mr. Larson, not by Commissioner Goad. We cannot attribute every statement made by Mr. Larson at the prior hearing to Commissioner Goad.

Commissioner Goad herself answered only a single question during the Mining Commission proceeding. We conclude that Mr. Larson's statements are too attenuated to support Tyrone's allegations of bias and that Tyrone has not demonstrated personal bias or prejudice sufficient to require disqualification. *See Las Cruces Prof'l Fire Fighters*, 1997–NMCA–031, ¶ 24, 123 N.M. 239, 938 P.2d 1384 (suggesting that a personal bias or personal prejudice may require disqualification if it is strong enough).

{46} We have required disqualification when there is evidence that a particular commissioner has made comments indicating that he or she has prejudged the case to be heard. *See Reid*, 92 N.M. at 415–16, 589 P.2d at 199–200. Unlike in *Reid*, there is nothing in this case indicating that Commissioner Goad had prejudged this case. At most, we have evidence that her membership in the Sierra Club indicated that she held a particular philosophy on environmental issues and had taken a position in a prior proceeding that Phelps Dodge should be required to meet the deadlines in the Mining Act. This evidence is insufficient to require disqualification. *See Las Cruces Prof'l Fire Fighters*, 1997–NMCA–031, ¶¶ 26, 29, 123 N.M. 239, 938 P.2d 1384.

## B. OTHER PROCEDURAL ISSUES

### 1. COMMISSIONER LEWIS

{47} According to Tyrone, Commissioner Lewis appeared and sat as the State Engineer's representative during closing arguments and voted on the merits of Tyrone's appeal. Tyrone objected, contending that Commissioner Lewis should not deliberate because he worked for NMED during a time when it was considering Tyrone's permit application and had made decisions on those matters. Tyrone also argues that the fact that Commissioner Lewis previously worked as a consultant for Tyrone "means that he was positioned to gain knowledge of matters outside the record in this appeal," and that he "also may have gained knowledge of matters outside the record while he was an NMED regulator of the Tyrone Mine."

{48} Commissioner Lewis said that he was the director of the Water Waste

Management Division between 1999 and the end of 2002. During that time he had recused himself from participating in any decisions regarding Tyrone because of his "past interactions" with Tyrone. He admitted that he knew some of the technical aspects of the site because there had been "casual technical discussion," but asserted that he was not a decision maker on any permitting decisions.

{49} Tyrone stated that Commissioner Lewis participated in technical studies that are part of the record in the case and may have had knowledge that he acquired while working with Tyrone that is not part of the record in this case. Tyrone identified some documents it claimed included his work. Tyrone asserted that, during Commissioner Lewis's tenure with Tyrone as a consultant, it was the company's "understanding that he was an author, and perhaps the principal author, of technical reports that, in essence, went into Tyrone's application for the closure permit." Tyrone's attorney stated, "I'm not pointing to any one particular document. I'm just saying there are a number of things in there that may have a bearing on this very case, and, in essence, [Commissioner] Lewis could be asked to be—to pass judgment on some work that he actually did on this case." Commissioner Lewis said he would decide the case "with the maximum amount of integrity that I have in me." The Commission denied Tyrone's motion to disqualify him.

{50} Our review of the transcript of the Commission's deliberations persuades us that Commissioner Lewis brought significant expertise on the technical issues in the case. We do not doubt that his prior employment gave him some knowledge about the Tyrone mine and these technical issues. But, as we have noted, it is impractical to require commissioners to sit with an entirely clean slate. *See Las Cruces Prof'l Fire Fighters*, 1997–NMCA–031, ¶ 26, 123 N.M. 239, 938 P.2d 1384. Commissioners are appointed because of their knowledge and expertise. One commissioner commented, "I would hate to think that I would be disqualified because I was familiar with the physical plant itself."

{51} Moreover, the degree of Commissioner Lewis's knowledge of matters outside the record is not well developed. Rather, the suggestion is that he "was positioned to gain knowledge" or "may have gained knowledge." Tyrone referred to the fact that Commissioner Lewis may have participated in some studies and documents, but it did not specifically identify the relationship of that prior work to the specific technical issues being decided by the Commission, or indicate whether it was favorable or unfavorable to Tyrone's position. If anything, Commissioner Lewis's prior work as a consultant for Tyrone may have been favorable to Tyrone. For all of these reasons, we conclude that Tyrone has not made a sufficient showing that Commissioner Lewis's participation denied it due process. *See Jones v. N.M. State Racing Comm'n*, 100 N.M. 434, 437, 671 P.2d 1145, 1148 (1983) (stating that the appellant has a duty to overcome the presumption of integrity in those serving as administrative adjudicators).

## 2. CHANGES IN COMPOSITION OF THE COMMISSION

{52} The evidentiary portion of the hearing was held during a ten-day period between October 27, 2003 and November 13, 2003, but closing arguments and deliberations did not occur until April 13–14, 2004, approximately five months later. Tyrone objects to the fact that the composition of the Commission had changed somewhat between the time evidence was taken and the time of deliberations and to the fact that Commissioner Derrith Watchman–Moore, who had acted as Chair, was no longer acting as Chair and did not attend deliberations. Commissioner Norton served as Chair during closing arguments and deliberations.

{53} Commissioner Watchman–Moore did not serve as Chair in April 2004 because the Governor had named her interim head of the Office of Indian Affairs. There was a hope that she would split time between her new job and her work at the Environment Department, but she did not because she was devoting all of her time to her new position. The Commission declined to continue the hearing until Commissioner Watchman–Moore could attend.

{54} We agree with Tyrone that it would seem best to retain the same composition of

the Commission from start to finish. However, this case was complex and lengthy, and it appears that the proceedings were broken into separate blocks of time because it was difficult to have all the commissioners, whose service is in addition to regular employment, commit large blocks of time to their Commission duties. Additionally, over time, people change jobs, and consequently commissioners must be replaced. These practical realities make it virtually impossible to maintain the same composition of a commission throughout a lengthy process such as this one. We are reluctant to impose any requirement that a commission, once it begins to hear a lengthy case, must not change composition until the case is finally determined.

{55} Our review of the transcript of the Commission's deliberation convinces us that both Commissioner Norton and Commissioner Lewis were very well versed in the evidence and the issues presented. Commissioner Norton, who had replaced Commissioner Watchman–Moore, said that he had "spent hours familiarizing [himself] with the record." Tyrone has not argued that these commissioners were not familiar with the record, nor has it made any specific argument that matters of credibility required the same commissioners who heard the testimony to be the decision makers. Under the facts of this case, we are not persuaded that Tyrone's due process rights were violated.

{56} We are also unpersuaded that the change in the Chair requires reversal. In judicial proceedings, the judge may change throughout the course of a case, and we do not require the litigation to begin over again just because a different person had made earlier rulings. Moreover, as we have stated, our review of the transcript of the deliberations persuades us that Commissioner Norton had familiarized himself with the record and was conversant with the issues. Tyrone has demonstrated no prejudice, and we conclude that, under the facts in this case, the fairness of the hearing was unaffected by the change in the Chair. *See Jones*, 100 N.M. at 436, 671 P.2d at 1147 (rejecting the appellants' due process claim where they failed to demonstrate prejudice).

## C. UNDUE INFLUENCE

{57} Tyrone has also objected to the fact that when NMED presented its closing argument, NMED counsel informed the Commission that NMED's Cabinet Secretary agreed with NMED's position. Because the Cabinet Secretary had designated Commissioner Norton, an NMED employee, to sit on the Commission, and Commissioner Norton was deliberating on the case, Tyrone argues that undue influence existed that would call into question the fairness of the proceeding. We agree that these relationships make administrative proceedings different from a standard judicial proceeding, but without more than is shown by this record, we decline to conclude that Tyrone has overcome the presumption that commissioners will decide the case with integrity. *See id.* at 437, 671 P.2d at 1148.

## CONCLUSION

{58} We hold that NMED is authorized to impose reasonable permit conditions. We hold, however, that the method used by the Commission to determine whether those standards were reasonable was flawed. We remand this matter to the Commission for the limited purpose of addressing the issues raised by Section 74–6–5(E)(3). The Commission has broad discretion to consider the manner in which it wishes to determine appropriate factors defining the relevant standard and need not reopen the entire case. It may take additional evidence, but it is not required to do so. Finally, we hold that Tyrone's arguments related to the composition of the Commission do not demonstrate a violation of due process.

{59} **IT IS SO ORDERED.**

WE CONCUR: A. JOSEPH ALARID, and CELIA FOY CASTILLO, Judges.