# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: <u>April 8, 2015</u>

**NO. 33,237**
**(consolidated with Nos. 33,238 and 33,245)**

**GILA RESOURCES INFORMATION PROJECT,**
**AMIGOS BRAVOS, TURNER RANCH**
**PROPERTIES, L.P., STATE OF NEW MEXICO,**
**ex rel. Gary King, Attorney**
**General, and WILLIAM C. OLSON,**

     Appellants,

v.

**NEW MEXICO WATER QUALITY**
**CONTROL COMMISSION,**

     Appellee,

and

**FREEPORT-MCMORAN CHINO MINES**
**COMPANY, FREEPORT-MCMORAN TYRONE,**
**INC., FREEPORT-MCMORAN COBRE**
**MINING COMPANY, and NEW MEXICO**
**ENVIRONMENT DEPARTMENT,**

     Intervenors-Appellees.

**APPEAL FROM THE WATER QUALITY CONTROL COMMISSION**
**Butch Tongate, Chair**

N.M. Environmental Law Center
R. Bruce Frederick
Douglas Meiklejohn
Santa Fe, NM

for Appellant Gila Resources Information Project and Turner Ranch Properties, L.P.

High Desert Energy + Environment Law Partners
Tracy Hughes
Santa Fe, NM

for Appellant Amigos Bravos

Water, Environment and Utilities Division
Office of the N.M. Attorney General
Hector H. Balderas, Attorney General
Tannis L. Fox, Assistant Attorney General
Santa Fe, NM

for Appellant State of New Mexico

High Desert Energy + Environment Law Partners
Charles F. Noble
Santa Fe, NM

for Appellant William C. Olson

Hinkle Shanor LLP
Thomas M. Hnasko
Julie A. Sakura
Santa Fe, NM

for Appellee N.M. Water Quality Control Commission

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
John J. Kelly
Stuart R. Butzier
Emil J. Kiehne
Albuquerque, NM

Gallagher & Kennedy, P.A.
Dalva L. Moellenberg
Anthony (T.J.) J. Trujillo
Santa Fe, NM

for Intervenors-Appellees Freeport McMoRan Chino Mines Co., Freeport-McMoRan Tyrone, Inc., and Freeport-McMoRan Cobre Mining Co.

N.M. Environment Department
Andrew P. Knight, Assistant General Counsel
Kathryn S. Becker, Assistant General Counsel
Santa Fe, NM

for Intervenor-Appellee N.M. Environment Department

**OPINION**

**SUTIN, Judge.**

{1}  The Attorney General (hereafter the State) and, separately, a group of appellants comprised of Gila Resources Information Project (GRIP), Amigos Bravos, Turner Ranch Properties, L.P., and William C. Olson (collectively Gila) appealed the Water Quality Control Commission's (the Commission) order adopting a set of regulations codified at 20.6.7 NMAC (12/1/2013) pertaining to ground water protection and supplemental permitting requirements for copper mine facilities (the Regulations). The Commission and, separately, a group of Intervenors-Appellees comprised of Freeport-McMoRan Chino Mines Co., Freeport-McMoRan Tyrone, Inc., Freeport-McMoRan Cobre Mining Co., and the New Mexico Environment Department (collectively Freeport) filed answer briefs. We consolidated three appeals and address both the State's and Gila's contentions in this Opinion.

{2}  Primarily at issue in this appeal is whether the Regulations adopted by the Commission violate the Water Quality Act (the WQA), NMSA 1978, §§ 74-6-1 to -17 (1967, as amended through 2013), and whether the Commission's reasons for adopting the Regulations were supported by sufficient evidence. We hold that the Regulations do not violate the WQA. Additionally, we conclude that Appellants' various attacks on the Commission's statement of reasons in support of its adoption

of the Regulations do not warrant reversal. We affirm the Commission's order adopting the Regulations.

**BACKGROUND**

**The Significance and Effect of the 2009 Amendments to the WQA**

{3}     Prior to 2009, the WQA did not allow the Commission to promulgate regulations that specified the methods to prevent or abate water pollution. Accordingly, the Commission, which is required to prevent or abate water pollution, did so as part of the copper mine permitting process through its "constituent agency," the New Mexico Environment Department (NMED). *See* § 74-6-2(K)(1) (stating in an appropriate context, "constituent agency" means the department of environment); § 74-6-5(A) (stating that the Commission "may require persons to obtain from a constituent agency designated by the commission a permit for the discharge of any water contaminant"). In the permitting process, an applicant was required to propose pollution-control measures to NMED for approval and, if needed, NMED would require specific pollution-control permit conditions. Parties who were adversely affected by the permitting action were entitled to appeal NMED's decision to the Commission. Section 74-6-5(O).

{4}     In 2009 the Legislature amended the WQA to require the Commission to adopt regulations particular to the copper industry that would specify "the measures to be

taken to prevent water pollution and to monitor water quality." Section 74-6-4(K). Prospective regulations were to be developed by a constituent agency, here NMED, which was charged with establishing "an advisory committee composed of persons with knowledge and expertise particular to the [copper] industry . . . and other interested stakeholders to advise [NMED] on appropriate regulations to be proposed for adoption by the [C]ommission." *Id*. Further, the Legislature mandated that, after the regulations were adopted, "permits for facilities in that industry shall be subject to conditions contained in the regulations." Section 74-6-5(D).

**The 2012-2013 Regulation-Making Proceedings**

{5}     NMED formed two committees to advise it on appropriate regulations to propose to the Commission: a "Copper Rule Advisory Committee" (the advisory committee) and a technical committee. The advisory committee included, among others, representatives from environmental groups (including GRIP and Amigos Bravos), mine owners and operators (including Freeport), and former Ground Water Quality Bureau Chief of NMED, William C. Olson, who was hired by NMED in this instance as a contractor to assist the advisory committee. The two committees met regularly over the course of seven months to review draft language and different approaches to regulating copper mining, and in August 2012, Mr. Olson provided NMED with a draft of copper mine regulations. NMED caused the draft regulations

3

to be edited by instructing Mr. Olson to incorporate modifications that had been suggested by Freeport, and although Mr. Olson argued that a number of Freeport's suggested modifications would violate the WQA, he eventually complied by incorporating Freeport's changes into the draft regulations. NMED submitted the edited version for public comment in September 2012. After holding two public meetings at which it took public comments on the draft regulations and after meeting with interested stakeholders, NMED prepared proposed regulations, and in October 2012, NMED petitioned the Commission to adopt its proposed regulations.

{6} GRIP, Amigos Bravos, and Turner Ranch Properties submitted a response to NMED's petition in which they argued that the Commission should reject the petition because NMED's proposed regulations violated the WQA. The Commission voted to accept the petition, assigned a hearing officer to the matter, and scheduled a hearing on the petition to be held in April 2013. Prior to the hearing, the State moved to remand NMED's proposed regulations to NMED on the ground that the proposed regulations would violate the WQA. On the same grounds, GRIP, Amigos Bravos, and Turner Ranch Properties moved to dismiss the petition. The Commission denied these respective motions.

{7} Additionally, the Commission granted, in part, a pretrial motion by the State to admit portions of the record from a 2007 adjudicatory proceeding titled "*In the*

4

*Matter of Appeal of Supplemental Discharge Permit for Closure (DP 1341) for Phelps Dodge Tyrone, Inc.*" (the Permit Adjudication). Specifically, the Commission ruled that its February 4, 2009, "Decision and Order on Remand" in the Permit Adjudication would be admitted at the hearing, while all other portions of the record from the Permit Adjudication would be excluded so as to avoid confusion and to save unnecessary expenditure of the Commission's time and resources. Although it will be discussed more thoroughly later in this Opinion, the Permit Adjudication and the 2009 Decision and Order on Remand proceeded from this Court's Opinion in 2006 in *Phelps Dodge Tyrone, Inc. v. New Mexico Water Quality Control Commission*, 2006-NMCA-115, 140 N.M. 464, 143 P.3d 502.

{8}     Following further reviews by NMED staff and expert witnesses, NMED edited the proposed regulations and filed a notice of amended petition in February 2013 that included a redlined version of the proposed regulations (the amended regulations), showing all changes. Over the course of ten days in April and May 2013, the Commission held a hearing on NMED's proposed amended regulations. All of the parties to this appeal presented technical testimony during the hearing. Following the hearing, the hearing officer gave all parties the opportunity to submit written closing arguments and proposed statements of reasons for the Commission's consideration. Attached to its proposed statement of reasons, NMED proposed additional changes

5

to the amended regulations. We will refer to this draft as the "final proposed regulations."

{9} After reviewing the record including the pleadings, the written testimony, exhibits, hearing transcript, public comments, and the hearing officer's orders, and after hearing final oral arguments from the parties during a public meeting, the Commission issued its Order and Statement of Reasons (the Order) on September 25, 2013, adopting NMED's final proposed regulations. The Order, which is the subject of this appeal, is a 214-page document that includes, among other things, the Commission's statement of 1,306 reasons supporting its decision to adopt the Regulations. NMED's final proposed regulations, to which we refer in this Opinion as "the Regulations," were codified in December 2013 at 20.6.7 NMAC.

**Legal Context and Terminology**

{10} The objective of the Regulations is "to supplement the general permitting requirements" of the permitting and ground water standards regulations, 20.6.2.3000 to .3114 NMAC (12/1/1995, as amended through 8/1/2014), "to control discharges of water contaminants specific to copper mine facilities and their operations to prevent water pollution." 20.6.7.6 NMAC. In the context of the WQA and the related regulations, the phrase "ground water" refers to "interstitial water which occurs in saturated earth material and which is capable of entering a well in sufficient amounts

6

to be utilized as a water supply[.]" 20.6.2.7(Z) NMAC (8/1/2014). The term "discharge" means "spilling, leaking, pumping, pouring, emitting, or dumping of a water contaminant in a location and manner where there is a reasonable probability that the water contaminant may reach ground water." 20.6.7.7(B)(18) NMAC.

{11} Discharge is regulated through a permitting process. *See* § 74-6-5(A) (stating that the Commission may require "persons," i.e, the owner or operator of a copper mine facility, to obtain a permit for the discharge of any water contaminant (a discharge permit)). Any person, in this case, a mine owner or operator, who wishes to discharge "effluent or leachate . . . so that it may move directly or indirectly into ground water" is required to apply to NMED for a discharge permit. 20.6.2.3104 NMAC (requiring a discharge permit). The Regulations reiterate this requirement. *See* 20.6.7.8(A) NMAC ("No person shall discharge effluent or leachate from a copper mine facility so that it may move directly or indirectly into ground water without a discharge permit approved by [NMED].").

{12} Ground water quality standards are provided by 20.6.2.3103 NMAC that specifies the pH range and the maximum concentration of various contaminants applicable to ground water for various uses, including human health, domestic water supply, and irrigation use. For ease of reference in this Opinion, we refer to the standards set forth in 20.6.2.3103 NMAC as "the 3103 standards." Pursuant to the

7

WQA, NMED is required to deny an application for a discharge permit if, in relevant part, its approval would violate any provision of the WQA or if "the discharge would cause or contribute to water contaminant levels in excess of [the 3103 standards]" as "measured at any place of withdrawal of water for present or reasonably foreseeable future use." Section 74-6-5(E)(2), (3).

{13} "Copper mine facility" refers to "all areas within which copper mining and its related activities that may discharge water contaminants occurs and where the discharge will or does take place[.]" 20.6.7.7(B)(13) NMAC. The phrase "copper mining and its related activities" includes, among other things, open pits, waste rock piles, ore stockpiles, leaching operations, tailings impoundments, and tailings or impacted stormwater. *Id.* An "open pit" is "the area within which ore and waste rock are exposed and removed by surface mining." 20.6.7.7(B)(41) NMAC. "Waste rock" is "all material excavated from a copper mine facility that is not ore or clean top soil." 20.6.7.7(B)(65) NMAC. "Tailings" means "finely crushed and ground rock residue and associated fluids discharged from an ore milling, flotation beneficiation[,] and concentrating process"; the "final repository of tailings" is a "tailings impoundment." 20.6.7.7(B)(59), (60) NMAC. "Impacted stormwater" is "direct precipitation and runoff that comes into contact with water contaminants within a copper mine facility

8

which causes the stormwater to exceed one or more of the . . . 3103 [standards.]" 20.6.7.7(B)(29) NMAC.

{14} "Leaching" refers to the process of "placing acidic leach solution on the tops and sides of [stockpiles]" of ore and other rock piles such that "[t]he solution percolates through the piles . . . dissolv[ing] the copper[.]" *Phelps Dodge*, 2006-NMCA-115, ¶ 5; 20.6.7.7(B)(33) NMAC (defining a "leach stockpile" as "stockpiles of ore and all other rock piles associated with mining disturbances that have been leached, are currently being leached[,] or have been placed in a pile for the purpose of being leached"). The leach solution is then collected and "pumped to a solvent extraction and electrowinning plant where the copper is removed from the solution." *Phelps Dodge*, 2006-NMCA-115, ¶ 5.

**"Place of Withdrawal" and the Earlier *Phelps Dodge* Appeals**

{15} The phrase "place of withdrawal" in Section 74-6-5(E)(3) is not defined by the WQA nor is it defined in any related regulation. The Legislature's intended meaning of "place of withdrawal" was the subject of this Court's discussion in *Phelps Dodge*, 2006-NMCA-115, ¶¶ 2, 7-8, 26-38, in which we considered Phelps Dodge's appeal from the Commission's imposition of conditions on its discharge permit for its copper mine. In *Phelps Dodge*, this Court concluded that while "the [L]egislature meant to capture the concept that clean water that is currently being withdrawn for use, or

9

clean water that is likely to be used in the reasonably foreseeable future, must be protected[,]" this standard is "difficult to apply to a [copper mine facility because] . . . it raises the question . . . as to the point at which the [L]egislature intended to measure compliance . . . . That is, should water quality be measured at the bottom of a waste rock pile, at the bottom of the mine pit, at wells located at the perimeter boundary of the mine property, or at some other point or points?" *Id.* ¶¶ 27-28. Recognizing that as a Court, and lacking the "technical expertise in hydrology, geology, or other applicable scientific topics[,]" we were ill-equipped to define "place of withdrawal" in the context of a copper mine facility, we remanded the matter to the Commission to "create some general factors or policies to guide its determination" of what constituted a "place of withdrawal." *Id.* ¶¶ 35-37. In so doing, we offered "no opinion as to whether the Commission should do so by way of rule[-]making or by simply deciding the factors as a part of [a] specific case, or both." *Id.* ¶ 35.

{16} On remand from our *Phelps Dodge* Opinion, in 2007 the Commission held a hearing, and in its February 4, 2009, Decision and Order on Remand referred to earlier in this Opinion identified several factors that NMED should consider in identifying places of withdrawal at the copper mine facility. The Commission's Decision and Order on Remand required NMED to act consistently with the order in identifying places of withdrawal and appropriate locations at which the effects of the

mine's discharges on ground water were to be measured and required NMED and the facility to "negotiate" permit conditions that appropriately reduced ground water contamination at those places of withdrawal.

{17} In a second appeal, in 2009, Phelps Dodge appealed the Commission's 2009 Decision and Order on Remand to this Court. During the pendency of that second appeal, some of the parties, including NMED and Phelps Dodge, sought the Commission's permission to depart from the remand order so as to pursue regulatory solutions to determine places of withdrawal, thereby avoiding further litigation over the meaning of that phrase. The Commission granted the parties relief from the directives of the Decision and Order on Remand to allow the parties to reach a settlement through various regulatory actions and processes, and Phelps Dodge subsequently withdrew its second appeal. One such regulatory action was the proceeding to establish the Regulations that are at issue in this appeal.

**The Present Consolidated Appeal**

{18} In the consolidated appeal now before us, Gila and the State (Appellants) contend that the Order should be reversed. Although they each present various arguments in support of this overarching contention, the main crux of their respective appeals is that the Regulations violate the WQA by allowing copper mines to pollute ground water wherever the mines operate regardless of whether the ground water is

11

or will be withdrawn for uses that require potable water. Additionally, Appellants challenge the sufficiency of the evidence supporting aspects of the Order. And finally, although they approach it differently, Appellants argue that by adopting the Regulations the Commission improperly circumvented the Decision and Order on Remand in the Permit Adjudication.

{19} We conclude that the Regulations do not violate the WQA, and we reject Appellants' challenges to the sufficiency of the evidence supporting the Commission's decision to adopt the Regulations. We further conclude that the Decision and Order on Remand had no bearing on the Commission's authority to adopt the Regulations. We affirm.

**DISCUSSION**

**Standard of Review**

{20} Regulations that have been enacted by an agency "are presumptively valid and will be upheld if [they are] reasonably consistent with the authorizing statutes." *N.M. Mining Ass'n v. N.M. Water Quality Control Comm'n*, 2007-NMCA-010, ¶ 11, 141 N.M. 41, 150 P.3d 991. "A party challenging [regulations] adopted by an administrative agency has the burden of establishing [their] invalidity[.]" *N.M. Mining Ass'n v. N.M. Mining Comm'n*, 1996-NMCA-098, ¶ 8, 122 N.M. 332, 924 P.2d 741.

{21}    This Court will set aside the Commission's order adopting regulations only if the order is "(1) arbitrary, capricious[,] or an abuse of discretion; (2) not supported by substantial evidence in the record; or (3) otherwise not in accordance with law." Section 74-6-7(B); *see Gila Res. Info. Project v. N.M. Water Quality Control Comm'n*, 2005-NMCA-139, ¶ 16, 138 N.M. 625, 124 P.3d 1164 (stating that an agency action is arbitrary or capricious "if it is unreasonable or without a rational basis, when viewed in light of the whole record." (internal quotation marks and citation omitted)); *Regents of the Univ. of Cal. v. N.M. Water Quality Control Comm'n*, 2004-NMCA-073, ¶ 29, 136 N.M. 45, 94 P.3d 788 (stating that an agency decision is supported by substantial evidence where "relevant evidence that a reasonable mind might accept as adequate" supports the conclusion (internal quotation marks and citation omitted)).

**The Regulations Do Not Violate the WQA**

{22}    Appellants make a number of arguments in support of their respective claims that the Regulations violate the WQA. We address these arguments in turn, combining them where it is reasonable to do so in order to avoid duplication. We begin, however, by describing the Regulations, generally.

{23}    Because the phrase "place of withdrawal" is not defined in the WQA, designating places of withdrawal is a matter left to NMED's and the Commission's

13

expertise. *See Phelps Dodge*, 2006-NMCA-115, ¶ 37 (recognizing NMED's authority to determine the locations of places of withdrawal, subject to the Commission's review and authority to define relevant factors). As we recognized in *Phelps Dodge*, in determining places of withdrawal, two competing interests are at stake: the need to protect water sources and the need to allow mining operations, which are "a necessary and important component of our economy and our modern way of life." *Id.* ¶¶ 27, 29. Further, we recognized that because mining has inevitable environmental impacts, it would be unrealistic and overbroad to conclude that an entire mining facility is a place of withdrawal such that water quality standards must be met everywhere within the facility's boundaries. *Id.* ¶ 33.

{24}    Under the Regulations, the primary method for protecting groundwater during the mine's operation is through discharge control at each mining "unit," that is, at the place of each mining-related activity, by containing ground water that exceeds applicable standards. Although the containment strategy may allow ground water underlying certain units to exceed the 3103 standards during mining operations, pursuant to the Regulations, those areas are not available as "places of withdrawal" during mining operations. The effectiveness of the discharge control at each mining unit is determined by monitor wells that are located on the perimeter of each unit, and should a monitor well detect an exceedance of the 3103 standards, the Regulations

14

require emergency repair, corrective action, and, if necessary, abatement measures. *See* 20.6.7.30(A) NMAC (governing the contingency requirements for copper mine facilities in the event of an exceedance of the 3103 standards).

{25}    The Regulations require monitor wells to be installed "as close as practicable around the perimeter and downgradient[1] of each open pit, leach stockpile, waste rock stockpile, tailings impoundment, process water impoundment, and impacted stormwater impoundment." 20.6.7.28(B) NMAC (footnote added). Monitor wells must be located in such a manner as to "detect an exceedance[] or a trend toward exceedance[] of the [3103] standards at the earliest possible occurrence, so that investigation of the extent of contamination and actions to address the source of contamination may be implemented as soon as possible." *Id*. The prospective locations of a monitor well must be stated in an application for a discharge permit for NMED's review and must include, among other things, information pertaining to "[t]he ground water flow direction beneath the copper mine facility used to determine the monitoring well locations[], including supporting documentation used to determine ground water flow direction." 20.6.7.28(A)(2) NMAC. In the event that monitor results reflect that the 3103 standards are exceeded, the Regulations require

---

[1] "Downgradient" means "[t]he direction that ground[]water flows[.]" Ecomii Green Dictionary a to z, http://www.ecomii.com/dictionary/downgradient (last visited Mar. 12, 2015).

corrective action, and if NMED determines that a monitor well "is not located downgradient of or does not adequately monitor the contamination source [that] it is intended to monitor," the Regulations require its replacement. 20.6.7.30(A), (B) NMAC. After the mine closes, the discharge permittee is required by the Regulations to take a number of steps to ensure continued ground water protection. *See generally* 20.6.7.33 NMAC (governing the closure requirements applicable to a copper mine facility); 20.6.7.35 NMAC (governing the post-closure requirements applicable to a copper mine facility).

{26}     Appellants argue that, in contravention of the WQA, the Regulations create a "point of compliance system" that allows a mine facility to pollute water under the entire mine facility up to a designated point (a point of compliance) at which a monitor well is used to ensure compliance with the 3103 standards. Appellants argue, further, that the Regulations violate the WQA because they allow  discharge permittees to pollute ground water underneath a mining facility without regard for places of withdrawal.

**Point-of-Compliance Argument**

{27}     We begin by addressing Appellants' point-of-compliance arguments. In *Phelps Dodge*, we noted the phrase "point of compliance" as being "a vertical surface located at the hydraulically downgradient limit of the waste management area that extends

down into the uppermost aquifer underlying the regulated units[.]" 2006-NMCA-115 ¶ 36 (internal quotation marks and citation omitted). A point of compliance was one "possible factor[]" this Court suggested that the Commission might consider in establishing a set of factors that could be used to determine places of withdrawal in the Permit Adjudication or in future rule-making proceedings. *Id.* ¶¶ 35-37. In 2009 the Legislature instructed the Commission to establish regulations for the copper industry based upon scientific and statutory considerations; however, the Legislature has remained silent on the issue of whether a point-of-compliance system is appropriate for New Mexico copper mining operations. *See* § 74-6-4(E), (K).

{28}     Whether Appellants' characterization of the Regulations as a point-of-compliance system is or is not proper is not significant to the outcome of this appeal. Assuming that the Regulations created a system that is properly characterized as a point-of-compliance system, nothing in the WQA prohibited the Commission from doing so. We are unpersuaded by Appellants' citations to out-of-state statutes and regulations by which they attempt to demonstrate that where legislators intended to create point-of-compliance systems, they did so expressly and/or with certain provisions that are not found in New Mexico's laws or regulations. We assume, based on our *Phelps Dodge* discussion, and based on the pervasiveness in other jurisdictions of laws and regulations pertaining to point-of-compliance systems, that our

17

Legislature was aware of the concept of a point-of-compliance system when it vested the Commission with authority to establish copper mine regulations. *Attorney Gen. v. Pub. Regulation Comm'n*, 2011-NMSC-034, ¶ 10, 150 N.M. 174, 258 P.3d 453 (stating that appellate courts presume that the Legislature is fully aware of relevant statutory and common law). We further assume that had the Legislature intended to expressly prohibit the Commission from establishing such a system, it would have done so. Instead, our Legislature chose to leave the decision whether to establish a point-of-compliance system or an alternative to the expertise of the Commission, and Appellants' argument to the contrary, that the WQA prohibits a point-of-compliance system, is not supported by the language of the WQA. We turn now to Appellants' additional arguments that the Regulations violate various specific provisions of the WQA.

**Places-of-Withdrawal Argument**

{29}    Section 74-6-5(E)(3) requires NMED to deny any application for a discharge permit if the discharge would cause or contribute to water contaminant levels in excess of the 3103 standards at any place of withdrawal. In turn, the Regulations expressly condition approval of a discharge permit upon the applicant's compliance with Section 74-6-5(E)(3). *See* 20.6.7.10(J)(3) NMAC (recognizing that NMED must deny a discharge permit if so required by Subsection E of Section 74-6-5(E)).

18

Nevertheless, although they approach it differently, Appellants argue that the Regulations violate Section 74-6-5(E)(3) because they permit water pollution without regard to places of withdrawal.

{30} Appellants argue that the Regulations violate Section 74-6-5(E)(3) and disregard this Court's *Phelps Dodge* "mandate" because the Regulations do not provide any basis for identifying places of withdrawal. Rather, Gila argues, the Regulations permit "extensive ground water pollution at all copper mines so long as 'applicable standards' are met in distant monitoring wells" and they "blindly permit[] widespread ground water pollution wherever copper mines happen to be located." The State shares Gila's view regarding the extent of ground water pollution permitted under the Regulations and argues that the Regulations allow copper mining facilities to pollute ground water underneath "its site up to a certain point, be it a monitoring well . . . or a property boundary."

{31} Appellants' argument that, pursuant to our *Phelps Dodge* Opinion, the Commission was required to include in the Regulations factors to be used in identifying places of withdrawal is premised on a misunderstanding of our holding in *Phelps Dodge*. In *Phelps Dodge*, this Court required the Commission, on remand, to create some general factors or policies to guide its determination of the location of places of withdrawal on the mine site; however, "[w]e offer[ed] no opinion as to

whether the Commission should do so by way of rule[-]making or by simply deciding the factors as a part of [the Permit Adjudication]." *Phelps Dodge*, 2006-NMCA-115, ¶ 35. The Commission's Decision and Order on Remand in which the Commission identified a number of factors to be used by NMED and the mining facility to establish places of withdrawal at the mine site reflects the Commission's compliance with our *Phelps Dodge* Opinion. The Regulations that are the subject of this appeal reflect further compliance with our *Phelps Dodge* Opinion, and as we discuss next, they reflect compliance with the WQA, insofar as the Commission created a set of concrete regulations via the rule-making process that specifically protect ground water underlying mine facilities so that areas within a mine facility may become places of withdrawal.

{32}    As discussed earlier in this Opinion, nearly three years after our *Phelps Dodge* Opinion was published, the Legislature amended the WQA to require the Commission to establish regulations particular to the copper mine industry. *See* § 74-6-4(K). Notably, however, the Legislature did not require the Commission to include in those regulations a list of factors or policies that must be used to determine places of withdrawal. *See id*. After the 2009 amendments to the WQA, determining the locations of places of withdrawal under Section 74-6-5(E)(3) was, as it always had been, left to the Commission's discretion. *See Phelps Dodge*, 2006-NMCA-115, ¶ 35

20

(recognizing that pursuant to Section 74-6-5(E)(3) the Commission must determine places of withdrawal). In sum, the Commission's decision not to include in the Regulations factors or policies to be used for determining places of withdrawal did not violate the WQA nor did it disregard a "mandate" from this Court.

**The Regulations Do Not Permit Widespread Ground Water Pollution**

{33}     Next we consider Appellants' arguments that the Regulations allow widespread ground water pollution in excess of the 3103 standards under an entire mine facility up to "distant" monitor wells or even to the property boundary. As discussed later in this Opinion, and having reviewed the Regulations, we conclude that the notions that the Regulations allow widespread pollution or that they allow a mine facility to pollute ground water underlying the entire facility or that the monitor wells may be "distant" are unfounded or otherwise exaggerated.

{34}     Pursuant to the Regulations, all areas within a mine facility except areas that fall within the perimeter of the monitor wells must meet the 3103 standards. *See* 20.6.7.28(B) NMAC (governing the placement of monitoring wells and requiring that the 3103 standards be met at each monitoring well and outside the monitoring-well perimeter). Thus, within a mine facility, any place at or beyond the monitor-well perimeter is water that may now and may in the future be withdrawn for human uses. Accordingly, every place within a mine facility at and beyond the monitor-well

perimeters is protected from ground water pollution, and therefore, may be used as a "place of withdrawal." *See Phelps Dodge*, 2006-NMCA-115, ¶ 27 (stating that the Legislature's use of the phrase "place of withdrawal" in Section 74-6-5(E)(3) captured "the concept that clean water that is currently being withdrawn for use, or clean water that is likely to be used in the reasonably foreseeable future, must be protected").

{35} Appellants' contentions that the monitor wells would be "distant" from the mining units or that the monitoring would only occur at the perimeter of the mine facility, thus allowing the entire area within the mine facility to exceed the 3103 standards are not supported by the language of the Regulations. The monitor wells must be placed as close as practicable around the perimeter and downgradient of each mining unit, and the placement of monitor wells and the number of monitor wells that are required at each unit is subject to NMED's approval. *See* 20.6.7.28 (A), (B) NMAC. In the hypothetical event that a prospective permittee intended to place monitor wells at a distance that any interested party deemed excessive, that party may raise the issue during the permitting process. *See* § 74-6-5(G) ("No ruling shall be made on any application for a permit without opportunity for a public hearing at which all interested persons shall be given a reasonable chance to submit evidence,

22

data, views[,] or arguments orally or in writing and to examine witnesses testifying at the hearing.").

{36} We next address Appellants' arguments regarding the extent to which the Regulations allow ground water pollution. Having rejected the notion that the Regulations permit water pollution within the entire boundary of a mine facility, we focus on the State's argument that the Regulations violate the WQA because they allow copper mining facilities to pollute ground water within a unit up to the point of a monitor well. We also address the related argument, raised by Gila, that the Regulations "frustrate[] the [WQA's] basic purpose" because the Regulations permit rather than abate and prevent ground water pollution within mining units.

{37} In promulgating the Regulations, the Commission was acting pursuant to the Legislature's mandate that it formulate regulations to "prevent or abate water pollution" while simultaneously weighing, among other things, the "social and economic value of the sources of water contaminants" and the "technical practicability and economic reasonableness of reducing or eliminating" them. Section 74-6-4(E)(2), (3). Thus, the Commission was required to strike what it deemed to be an appropriate balance between the need to prevent or abate water pollution and the need to create regulations with which the mining industry could reasonably and practicably comply. To the extent that Appellants' arguments are implicitly based on

23

the premise that the Commission was required by the WQA to establish regulations that would totally prevent mining operations from polluting ground water, we reject them. *See Phelps Dodge*, 2006-NMCA-115, ¶ 33 (recognizing that it is unrealistic to require that all ground water underlying a mine site meet drinkable standards).

{38}     Appellants cite various provisions of the Regulations pursuant to which the ground water underlying discrete mining units is not required to meet the 3103 standards to exemplify their point that the Regulations permit ground water contamination. While the Commission acknowledged that the containment strategy required by the Regulations may allow ground water underlying certain units to exceed the 3103 standards during mining operations, to say that the Regulations therefore permit ground water contamination goes too far. As noted earlier, containing ground water that exceeds the 3103 standards is the primary method of controlling discharge. Pursuant to the Regulations, each mining unit is governed by requirements that specifically identify the method by which contaminated water is controlled.

{39}     For example, Appellants argue that the Regulations permit ground water pollution because, during mining operations and after closure, the 3103 standards do not apply to ground water that is located inside the " 'area of open pit hydrologic containment' and related 'open pit surface drainage area.' " *See* 20.6.7.24(D) NMAC

24

("During operation of an open pit, the [3103 standards] do not apply within the area of open pit hydrologic containment."). An

> "[a]rea of open pit hydrologic containment" means, for an open pit that intercepts the water table, the area where ground water drains to the open pit and is removed by evaporation or pumping, and is interior to the department approved monitoring well network installed around the perimeter of an open pit[.]"

20.6.7.7(B)(5) NMAC. An " '[o]pen pit surface drainage area' means the area in which storm water drains into an open pit and cannot feasibly be diverted by gravity outside the pit perimeter, and the underlying ground water is hydrologically contained by pumping or evaporation of water from the open pit." 20.6.7.7(B)(42) NMAC. Thus, although it is true that the 3103 standards do not apply to open pits during mining operations, Appellants fail to acknowledge the Regulations' provision for ground water protection in that area by removing the contaminated water from the open pit. *See* 20.6.7.33(D) NMAC.

{40}     After closure of mining operations, Part 20.6.7.33(D) NMAC of the Regulations requires a permittee to provide a detailed closure plan for open pits that will "minimize the potential to cause an exceedance of" the 3103 standards. Under that part of the Regulations, any water within an open pit that is predicted to flow into the ground water must meet the 3103 standards. 20.6.7.33(D)(2) NMAC. An exception applies only to open pits that are determined to be "hydrologic evaporative

25

sink[s]," meaning that evaporation of the water in the open pit will exceed the inflow and will, therefore, not flow into the ground water. 20.6.7.33(D)(1) NMAC. Thus, Appellants' assertion that the Regulations permit the water from open pits to exceed the 3103 standards perpetually after closure is inaccurate.

{41}     Gila argues, further, that the Regulations violate the WQA because they permit widespread ground water pollution above the 3103 standards without requiring the permittee to apply for a variance. Section 74-6-4(H) provides that under particular circumstances, the Commission "may grant an individual variance from any regulation[.]" Nothing in the Regulations purport to alter the Commission's ability or discretion to grant a variance under Section 74-6-4(H), and having rejected Gila's premise that the Regulations "permit[] widespread ground water pollution[,]" we decline to consider this argument further.

{42}     In sum, Appellants have failed to demonstrate that the Regulations violate any provision of the WQA. Although the Regulations' provisions are not perfectly protective of ground water underlying a mining facility, the WQA did not require them to be. *See* § 74-6-4(E). The Commission determined that the Regulations established "efficient measures and clear provisions to prevent and contain ground water contamination[,]" and having reviewed the various at-issue provisions, we cannot conclude that the Commission reached this conclusion in error.

26

**Collateral Estoppel Does Not Apply to the Commission's Rule-Making Procedure**

{43}     Appellants each argue that collateral estoppel precluded the Commission from "re[-]litigating" or "re[-]adjudicating" facts or issues that were resolved in the Commission's Decision and Order on Remand. Yet, the State acknowledges that issues related specifically to the mine at issue in *Phelps Dodge* "were not in fact re[-]litigated in the Commission's rule[-]making" and that the purpose of rule-making proceedings that ultimately resulted in the Commission's adoption of the Regulations at issue in this appeal was "entirely different" from the purpose of the Commission's proceedings on remand from our *Phelps Dodge* Opinion. We disagree with Appellants' invocation of the doctrine of collateral estoppel in the context of this appeal.

{44}     Collateral estoppel bars "the re[-]litigation of . . . facts or issues actually and necessarily determined in [a] previous litigation" where, among other things, the same issue was presented and finally adjudicated in a previous lawsuit between the same parties. *Rosette, Inc. v. United States Dep't of the Interior*, 2007-NMCA-136, ¶ 39, 142 N.M. 717, 169 P.3d 704. Unlike the Permit Adjudication that involved a dispute between Phelps Dodge Tyrone, Inc. and NMED concerning a single discharge permit, the Commission's adoption of the Regulations at issue in this case was not an adjudicatory proceeding. *Phelps Dodge*, 2006-NMCA-115, ¶ 2; *see Rauscher, Pierce,*

27

*Refsnes, Inc. v. Taxation & Revenue Dep't*, 2002-NMSC-013, ¶ 42, 132 N.M. 226, 46 P.3d 687 (recognizing that rule-making and adjudication are characteristically distinct because, among other things, rule-making affects the rights of a broad class of individuals, whereas adjudication involves concrete disputes affecting specific individuals). Because the at-issue rule-making proceeding was not an adjudication, the principle of collateral estoppel has no bearing on the Commission's decision to adopt the Regulations.

{45} Setting aside the "collateral estoppel" label, it is clear that Appellants' argument is actually an attack on the Commission's decision, as stated in the Order, to allow the Phelps Dodge Tyrone mine to operate prospectively under the Regulations instead of under the directives of the Commission's Decision and Order on Remand. This argument is not persuasive.

{46} The Commission's Decision and Order on Remand preceded the Commission's rule-making activity at issue in this appeal. Before the Commission's Decision and Order on Remand went into effect, and while it was the subject of a pending appeal, the Commission granted the parties in *Phelps Dodge* relief from the directives of the order, including any directives applicable to determining where, within the Phelps Dodge Tyrone mine facility then at issue, places of withdrawal were located. The Commission's stated purpose for relieving the parties from the directives of the

28

Decision and Order on Remand was, in relevant part, to allow the parties to achieve a settlement by allowing the at-issue rule-making process to occur. According to legislative mandate, after the Regulations were adopted, copper mine permits were to be subject to the conditions of the Regulations. *See* § 74-6-5(D) ("After regulations have been adopted . . . permits for facilities in [the copper] industry shall be subject to conditions contained in the regulations."). Thus, contrary to the State's argument that the Commission violated the WQA by permitting the Phelps Dodge Tyrone mining site at issue in *Phelps Dodge* to operate subject to the Regulations, the Commission is, in fact complying with Section 74-6-5(D). To the extent that Appellants wish to challenge that mine's future application for a permit under the Regulations, they may do so in the relevant permit proceedings. *See* § 74-6-5(G) (requiring a public hearing before a ruling is made on a permit application).

**The Order Does Not Require Reversal**

{47}     Appellants argue that because the Commission adopted Freeport's version of the regulations verbatim, the Order adopting the Regulations should not be afforded deference. Further, the State urges this Court to adopt an alternative version of the Regulations that was submitted jointly by Appellants to which they refer as the "Joint Proposal." Gila argues that the Order does not support its adoption of the Regulations

29

because many of its 1,388 findings are contrary to law, arbitrary and capricious, and not supported by substantial evidence. We address these arguments in turn.

{48} Appellants' argument that the Order is not entitled to deference derives from the proposition that courts and administrative agencies acting in an adjudicatory capacity should avoid "wholesale verbatim adoption of a party's proposed findings [of fact] and conclusions" of law. *Bernier v. Bernier ex rel. Bernier*, 2013-NMCA-074, ¶ 15 n.4, 305 P.3d 978 ("The practice of full scale verbatim adoption of extensive requested findings of fact and requested conclusions of law of the prevailing party . . . can cause this Court on appeal to grant less deference to [them] than is otherwise accorded."); *Nunez v. Smith's Mgmt. Corp.*, 1988-NMCA-109, ¶¶ 1, 4, 108 N.M. 186, 769 P.2d 99 (indicating that the principle applies as well to administrative agencies acting in their adjudicatory capacity). The State does not cite any authority to show that this principle applies to an agency's statement of reasons in support of its adopted regulations which are "presumed valid and will be upheld if reasonably consistent with the statutes that they implement." *Wilcox v. N.M. Bd. of Acupuncture & Oriental Med.*, 2012-NMCA-106, ¶ 7, 288 P.3d 902 (internal quotation marks and citation omitted).

{49} Further, we summarily reject the State's suggestion that this Court "should" adopt the Joint Proposal. The authority to adopt regulations pertaining to the copper

industry was granted exclusively to the Commission by the Legislature. *See* § 74-6-4(K). This Court's authority is limited to reviewing the Regulations, and if called for, under particular circumstances, setting aside the Commission's actions. *See* § 74-6-7(B).

{50}    We turn now to Gila's attack on the Order. Gila argues that a number of the Commission's reasons for adopting the Regulations should be set aside because they are based on an incorrect interpretation of the WQA. To the extent that Gila's argument in this regard reiterates contentions that were addressed earlier in this Opinion, we do not address them again.

{51}    Gila attacks a portion of the Order adopting Part 20.6.7.21(B) NMAC. Part 20.6.7.21(B) NMAC governs the "[e]ngineering design requirements for new waste rock stockpiles[,]" and it enumerates the minimum requirements that must be "met in designing engineered structures for waste rock stockpiles at copper mine facilities unless the applicant or permittee can demonstrate that an alternate design will provide an equal or greater level of containment." In relevant part, the Commission stated in its reasons for adopting that provision that

> [an NMED witness] testified that, during mining operations, water use
> within the mine area would be controlled by the mine operator and that
> water produced would be used for mining purposes. Consequently,
> during the period of mine operation, ground water within the mine area,
> including the area of a waste rock stockpile, would not be available for
> domestic or agricultural use. [The witness] further testified that,

31

following closure, the area around and under a waste rock stockpile could become a place of withdrawal of water for domestic or agricultural use.

{52} Gila argues that the Commission relied on the foregoing witness testimony to find that "places of withdrawal are limited to present domestic and agricultural uses of water that occur somewhere outside the copper mine facility." Gila does not demonstrate where, in the record or in the Regulations, the Commission stated that "places of withdrawal are limited to [areas] . . . outside the copper mine facility." Nor can such a finding or provision be reasonably inferred from the foregoing testimony. We do not consider this unsupported argument further. *See* Rule 12-213(A)(4) NMRA (requiring an appellant to provide record proper citations in support of each argument).

{53} Gila also argues that the witness's testimony supports a conclusion that the ground water underlying a waste rock stockpile is entitled to protection because it has a reasonably foreseeable future use. Gila's argument in this regard does not demonstrate a conflict. The Commission found that a new waste rock stockpile that is designed in accordance with Part 20.6.7.21(A) and (B) NMAC will "not typically result in ground water contamination." Thus, although, according to the witness, the mine will use the underlying ground water for its own purposes, the area underlying waste rock stockpiles could be used as a place of withdrawal after the mining

32

operations because the requisite design of the waste rock stockpiles is expected to preserve the ground water quality. Therefore, to the extent that Gila contends that the ground water underlying a waste rock stockpile is entitled to protection, the Regulations comport with Gila's contention.

{54} Gila argues, further, that the Commission's finding that an NMED witness "testified that requiring a variance versus approving proven technologies by rule is a distinction without a difference" was "contrary to law and not based on substantial evidence." In support of this argument, Gila claims that the witness was not competent to testify regarding rule-making or variance proceedings. Contrary to the Rules of Appellate procedure, Gila does not show whether, and if so, where in the record it raised the issue of the competence of NMED's witness to testify regarding a distinction between a variance and the Regulations. *See* Rule 12-213(A)(4). We will not search the record to determine whether the argument was raised before or resolved by the Commission, and therefore this argument presents no issue for our review.

{55} Gila also attacks the Order on substantial evidence grounds. On appeal, the party challenging the sufficiency of the evidence supporting an administrative agency's action "must set forth the substance of *all* evidence bearing upon the proposition" in the light most favorable to the agency's decision and "then

33

demonstrate why, on balance, the evidence fails to support the finding made." *Martinez v. Sw. Landfills, Inc.*, 1993-NMCA-020, ¶¶ 8-11, 115 N.M. 181, 848 P.2d 1108; *see* Rule 12-213(A)(3). Instead of presenting its argument in the foregoing manner, Gila points to the evidence in the record that contradicts the Commission's findings and that, in Gila's view, supported adoption of an alternative version of the Regulations and repeatedly asserts that "substantial evidence contradicts" various findings of the Commission.

{56} Gila's decisions to omit citations to the evidence in the record that supported the agency's decision and to present the evidence in the light most favorable to itself leaves to this Court the task of digging through the voluminous record to determine whether, "on balance, the evidence fails to support the [Commission's] finding[s]." *Martinez*, 1993-NMCA-020, ¶ 10; *see McNeill v. Burlington Res. Oil & Gas Co.*, 2007-NMCA-024, ¶ 16, 141 N.M. 212, 153 P.3d 46 ("The question is not whether substantial evidence exists to support the opposite result, but rather whether such evidence supports the result reached." (internal quotation marks and citation omitted)), *aff'd*, 2008-NMSC-022, 143 N.M. 740, 182 P.3d 121. This we will not do. *Martinez*, 1993-NMCA-020, ¶¶ 13, 15 (stating that "it is not the responsibility of the reviewing court to search through the record to determine whether substantial evidence exists to support a finding[,]" recognizing that in a whole record review this

34

Court "should be able to rely entirely on the appellant's brief-in-chief in canvassing all the evidence bearing on a finding or a decision," and noting that "the reviewing court should [not] have to supplement the appellant's presentation of the evidence"). Gila's substantial evidence arguments do not warrant reversal.

{57} Gila also argues that the Commission failed to review Appellants' Joint Proposal or any of Appellants' "closing submittals," and as a result, the Commission "made numerous erroneous findings in which it mischaracterize[d] . . . Appellants' . . . recommended [regulation] changes or states that they failed to submit any recommended changes." In support of this argument, Gila cites more than 100 of the Commission's allegedly erroneous findings and hundreds of pages of Appellants' supporting documentation. Apparently Gila's expectation is that as to each of the 100-plus findings, this Court will ferret out the relevant portions from the hundreds of pages of Appellants' broadly cited documentation to determine whether the Commission's findings were erroneous. Additionally, having itself notably failed to set out the evidence bearing upon the proposition in the light most favorable to the agency's decision, Gila admonishes this Court that after we review the record, we must refrain from "supplying the reasons" supporting the Order.

{58} Again, we remind Gila that it is Appellants' burden in challenging the sufficiency of the evidence to set out all of the evidence bearing on a proposition and

to specifically attack contested findings. *Martinez*, 1993-NMCA-020, ¶ 9; *see* Rule 12-213(A)(3), (4). Even when undertaking a whole-record review, it is not the duty of this Court to search through the record seeking the bases for reversal or to re-weigh the evidence. *See Martinez*, 1993-NMCA-020, ¶¶ 12-15 (explaining that in a whole-record review it is incumbent upon the appellant to present "all the evidence bearing on a finding or a decision, favorable or unfavorable" to show that the evidence supporting the decision is not substantial "when viewed in the light that the *whole record* furnishes" and "it is not the responsibility of the reviewing court to search through the record to determine whether substantial evidence exists to support a finding" (internal quotation marks and citation omitted)); *see also Regents of the Univ. of Cal. v. N.M. Water Quality Control Comm'n*, 2004-NMCA-073, ¶ 29, 136 N.M. 45, 94 P.3d 788 (stating that in reviewing an agency's decision, this Court will not re-weigh the evidence). Further, we need not search the record to supply support for the findings in the Order, in the absence of a showing to the contrary, we presume that those findings were correct. *Pickett Ranch, LLC v. Curry*, 2006-NMCA-082, ¶ 57, 140 N.M. 49, 139 P.3d 209 ("[C]ourts presume regularity and correctness on the part of administrative [agencies.]").

{59} Additionally, Gila's assertion that the Commission failed to consider Appellants' Joint Proposal and their "closing submittals" is directly contradicted by

36

the record. To that end, we observe the Commission's transcribed deliberations in which each member of the Commission confirmed that they had reviewed each party's "written closing arguments and proposed statements of reason" and during which the contents of Appellants' Joint Proposal were reviewed and discussed.

{60}    In sum, Appellants have not demonstrated that the Order provides any basis for reversal. We conclude that Appellants' attacks on the Commission's findings as unsupported by sufficient evidence or as being contrary to law do not warrant reversal.

**CONCLUSION**

{61}    We affirm the Commission's order adopting the Regulations.

{62}    **IT IS SO ORDERED.**


_____
                                **JONATHAN B. SUTIN, Judge**

**WE CONCUR:**


_____
**MICHAEL E. VIGIL, Chief Judge**


_____
**LINDA M. VANZI, Judge**